Emory SEARCEY, Tom Coffin, Zachary Coffin, Constancia Romilly, Chaka Forman, Anne Nicholson, Eric Carter, Don Stone, John Storey, Flora Stone and the Atlanta Peace Alliance, Plaintiffs–Appellees,

v.

J. Jerome HARRIS, individually and in his official capacity as Superintendent of the Atlanta Public Schools, Atlanta Board of Education, Defendants–Appellants,

United States of America, Intervening–Defendant, Appellee.

No. 88–8327.

United States Court of Appeals, Eleventh Circuit.

Nov. 21, 1989.

---

Bruce H. Beerman, Fortson & White, Atlanta, Ga., for CRIM.

G. Stephen Parker, SLF, Inc., Robert B. Baker, Jr., William O. Miller, Atlanta, Ga., for amicus, Southeastern Legal Foundation, Inc.

Ralph Goldberg, Atlanta, Ga., James H. Feldman, Jr., Central Committee for Conscientious Objectors, Philadelphia, Pa., for Searcey, et al.

Robert L. Barr, Jr., Jane Wilcox Swift, Asst. U.S. Atty., Atlanta, Ga., John F. Cordes, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Robert D. Kamershine, Washington, D.C., for U.S.

Jeffrey O. Bramlett, Bondurant, Mixon & Elmorf, Cathleen M. Mahoney, Atlanta, Ga., for amicus, Presbyterian Church of USA.

Before KRAVITCH and CLARK, Circuit Judges and HENDERSON, Senior Circuit Judge.

CLARK, Circuit Judge:

The Atlanta Peace Alliance (APA) challenged the policy of the Atlanta School Board regarding access of military and nonmilitary groups to the Atlanta schools. The APA[1] brought suit contending that the School Board's refusal to grant the APA access to programs known as Career Day and Youth Motivation Day and to place information on bulletin boards and in guidance counselors' offices violated the APA members' First Amendment rights. The district court held that the denial of access to bulletin boards, guidance counselors and Career Day was unconstitutional. The Board has only appealed the district court's determination that several of the regulations concerning Career and Motivational Day are unconstitutional.

Thomas F. Homann, San Diego, Cal., for amicus, COMD.

1. APA and several individual peace activists brought an action for declaratory and injunctive relief against Dr. Alonzo Crim individually and in his official capacity as Superintendent of the Atlanta Public Schools and the Atlanta Board of Education (Board). Jerome Harris has been substituted as a party for Dr. Alonzo Crim. F.R. A.P. 43(c).

## I. FACTS [2]

A major objective of the Atlanta School Board has been to improve the post-secondary opportunities available to its students, of whom 92% may be classified as "minority" and 85% classified as "poor." The Board has created programs to motivate the students to set career and educational goals and to inform the students of the opportunities that are available. The Board has involved the community in two specific programs to accomplish these goals: Youth Motivation Day and Career Day. At Youth Motivation Day, community members come into school to share their experience and to inspire students to continue their education as the best means of achieving success. At Career Day, community members speak with students about more specific job opportunities and the skills they need to attain specific jobs. A major emphasis at both programs has been stressing the importance of finishing high school and seeking further education or training after graduation. There is no set format to these programs; some schools present several Career or Motivational Days throughout the year and others combine the two programs into one event.[3] Moreover, until the experience with the APA, the School Board only had a general policy relating to career education;[4] it was left to the discretion of each school principal to run the program as he or she saw fit. Generally, a program would include a keynote speaker at an assembly, after which the students would go to different classrooms to hear particular speakers. Often the speaker and the students would engage in a discussion in these smaller groups. Although the programs varied at each school, one constant was that there were no restrictions as to the content of the speeches or discussions. *See, e.g.,* Record, Vol. 9, at 234.

In February of 1983, the APA sent a letter to each of the Atlanta high school principals requesting permission to place literature in guidance counselors' offices, to place advertisements in school newspapers and to appear at Career Days. They submitted a plan to the Board but the Board took no action. In the meantime, two high school principals accepted the literature. In June, 1983, the APA representatives met with then Superintendent Alonzo Crim to discuss the APA's access to the school programs. Dr. Crim agreed to distribute the materials to the guidance counselors, to allow the APA to set up a table at Career Day, to make a list of APA speakers available to the high schools, and to allow the APA to place paid advertisements in the school year books.

After some publicity about Dr. Crim's agreement with the APA, on October 4, 1983, the School Board reviewed Dr. Crim's decision and directed him to deny APA all access to the schools. At the same time, the Board directed Dr. Crim to develop a policy governing Career Days. In April 1984, however, the Board had not adopted any policy regarding Career Days and still completely barred the APA from the schools. The APA then filed suit in the district court contending that the School Board was violating their members' First Amendment rights. On August 13, 1986, the district court granted partial summary judgment in favor of the plaintiffs and entered a preliminary injunction prohibiting the Board from denying the APA an opportunity substantially equal to that afforded to the military recruiters to participate in Career Days and place information on bul-

---

**2.** The facts of this case are set out in length in the district court opinions, *Searcey v. Crim,* 681 F.Supp. 821 (N.D.Ga.1988); *Searcey v. Crim,* 642 F.Supp. 313 (N.D.Ga.1986), and this court's prior opinion. *Searcey v. Crim,* 815 F.2d 1389 (11th Cir.1987). We summarize the facts relevant to this appeal.

**3.** Although some schools may have separate Career Day and Motivational Day programs, all testimony in the district court referred to the two programs as one single event. Any refer-

ence in this opinion to Career Day therefore includes both Career Day and Motivational Day.

**4.** When the APA first sought access to Career Day, the Board's only official policy stated that career education was necessary to "enable[ ] students of all ages to examine their attitudes, interests, aptitudes, and abilities in order to relate them to career opportunities, and to make valid decisions regarding further education and future endeavors." D.Exh. 6.

letin boards and in guidance counselors offices. The Board filed an interlocutory appeal and this court affirmed in part, vacated in part, and remanded for further proceedings. The case then proceeded to trial on the issue of whether the denial of access to Career Day and bulletin boards and guidance counselor's offices was unconstitutional. The district court found that the bulletin boards and guidance counselor's offices were created public forums and that the Board had not asserted a compelling interest justifying denying the APA access. The School Board has not appealed that ruling.

Prior to trial, at the urging of the district court, the Board adopted a uniform policy relating to Career Day. The policy states that

> The Board believes that schools should provide educational programs that are pertinent to the practical aspects of postsecondary life and to the world of work. The Board therefore supports "Career Day" programs as part of the general curriculum programs for our schools. Career Day is to be a program which allows students to gain career awareness and to explore career opportunities in various fields. Participants in "Career Day" programs shall have direct knowledge of the career opportunities about which they speak and shall be limited to providing appropriate information about career fields. Participants shall not be allowed to criticize or denigrate the career opportunities provided by other participants. Written information about career opportunities may also be made available to students at school sites subject to the conditions imposed above. Restrictions may not be imposed on the types of career opportunities in such material. The Superintendent shall prepare appropriate administrative regulations for the implementation of this policy.

D. Exh. 5. By trial, however, the Board still had not adopted administrative regulations to interpret the policy. When the district court deferred ruling until the regulations were adopted, the Board adopted

Administrative Regulations to govern Career Days which are included as an appendix to this opinion.[5] The regulations require an individual or group who wishes to participate in Career Day to provide sufficient information to the school principal to show that they will communicate information in keeping with the goals of Career Day. If a school principal denies a request to participate, the individual may appeal the denial to a Central Career Day Committee. The regulations also require participants to adhere to the regulations in their presentations. In the event that a participant violates a regulation, the Central Committee is authorized to impose appropriate sanctions including barring that individual or his group from further participation in Career Days.

The regulations also expand on the general policy with respect to who may participate and what participants may say: the regulations specifically interpret the policy's requirement that participants have direct knowledge of the subject matter and present appropriate information. Regulation 9 interprets the "direct knowledge" requirement to include those individuals who by virtue of training, education or experience possess information that would be useful to students in making career choices. However, Regulation 9 also requires each presenter to have "some *present affiliation* or authority with that career field about which he or she is to make a presentation." (emphasis added).

In addition, the regulations define "appropriate information" as information that is helpful to students in explaining career options. Both the policy and regulations, however, specifically prohibit a participant from criticizing or denigrating the opportunities presented by other participants. The regulations specifically state that "information shall be conveyed in as positive and encouraging a manner as possible so as to be motivational to students." Reg. 10. Finally, presenters "whose primary focus or emphasis is to discourage a student's participation in a particular career field" are

5. The court gave each party fifteen days after the adoption of the regulations for comment.

totally prohibited from participating in Career Day. Regs. 10, 11.

On March 4, 1988, the district court entered a written order finding that Career Day was a nonpublic forum, but that the direct knowledge requirement and prohibition on criticism violated APA's first amendment rights. The district court held that the direct knowledge, present affiliation, and no criticism regulations were unreasonable restrictions on access to Career Day. In addition, the court held that these regulations and the regulation banning groups whose primary focus is to discourage students from a particular field were unconstitutional because they were written with an intent to suppress APA's viewpoint. Thus, the court entered final judgment and a permanent injunction enjoining the Board from denying the APA "an opportunity, substantially equal to that afforded military recruiters, to present peace oriented education and career opportunities to Atlanta public school students by ... participating in Career Days and Youth Motivation Day programs." More specifically, the court enjoined the Board from enforcing against the APA the Career Day regulations to the extent that the regulations 1) prevent APA from giving information of peace oriented education or career fields; 2) require APA to have direct knowledge of the opportunities about which they speak; 3) prevent APA from criticizing or denigrating military careers; 4) require APA's primary focus not to be to discourage students from participating in a particular field; and 5) require APA members to have a present affiliation with the fields about which they speak. The School Board appealed. Since the APA does not challenge the district court's finding that Career Day is a nonpublic forum, the only issue presented on appeal is whether specific aspects of the Career Day policy and administrative regulations are valid regulations of First Amendment activity in a nonpublic forum. More specifically, the Board does not contend that it may prevent the APA from presenting information about peace oriented opportunities. Instead, the Board challenges the district court's conclusions that the direct knowledge, present affiliation, no criticism and no discouragement regulations are unconstitutional.

## II. DISCUSSION

### A. The law

The Supreme Court has explained that the type of restrictions which may be placed on First Amendment activities depends in large part on "the nature of the relevant forum." *Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). In a traditional public forum and a "created" public forum, the government may enforce content based restrictions only if necessary to serve a compelling state interest and narrowly tailored to serve that interest.[6] The government may also enforce content neutral, *i.e.*, time, place and manner regulations, which are narrowly tailored to serve a significant interest but still leave open ample alternative means of communications. *Perry Education Ass'n v. Perry Local Education Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *United States v. Belsky*, 799 F.2d 1485, 1488 (11th Cir.1986). In a nonpublic forum, however, the government enjoys considerably more power over the use of its property: it may impose content based restrictions which are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448 (quoting *Perry*, 460 U.S. at 46, 103 S.Ct. at 955); *Belsky*, 799 F.2d at 1488; *M.N.C. Hinesville v. Department of Defense*, 791 F.2d 1466, 1474 (11th Cir. 1986). The restrictions may "be based on subject matter and speaker identity so long as the distinctions are reasonable in light

---

6. Traditional public forums are those areas such as streets and parks that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

The government may also create a limited or created public forum when it intentionally opens a place or means of communication to the public. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449.

of the purposes served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. In this case, the Board's Career Day policy and regulations will be upheld if they are reasonable in light of the purposes of the forum and were not promulgated to suppress the viewpoint of the APA.

Before undertaking this analysis, it is necessary to discuss an argument raised by the Board. The School Board argues that *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), changes the First Amendment analysis applied to school officials' decisions relating to curricular programs. In *Hazelwood*, students sued when the principal refused to publish several articles in a school newspaper. *Id.* at 262, 108 S.Ct. at 565. In upholding the school's actions, the Supreme Court held that educators may exercise control over student expression in a curricular program if the restrictions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. at 571. We fail to see how this standard differs from the *Cornelius* standard for nonpublic forums; instead it is merely an application of that standard to a curricular program. Since the purpose of a curricular program is by definition "pedagogical," the *Cornelius* standard requires that the regulations be reasonable in light of the pedagogical purposes of the particular activity. *Hazelwood* therefore does not alter the test for reasonableness in a nonpublic forum such as a school but rather provides the context in which the reasonableness of regulations should be considered.[7] *See Cornelius*, 473

U.S. at 811, 105 S.Ct. at 3453 ("reasonableness of the Government's restrictions of access to a nonpublic forum must be assessed in light of the purpose of the forum and all the surrounding circumstances").

█ A school serves an important function in our society: it serves as "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him adjust normally to his environment." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Because of the special role of schools in our society, the Supreme Court has allowed school officials to regulate speech based on content where such a regulation would not be upheld in a nonschool setting. *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570; *see Bethel School District v. Fraser*, 478 U.S. 675, 681, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). In addition, school officials may structure curricular programs to "assure that participants learn whatever lessons the activity is designed to teach." *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570. The Supreme Court in *Hazelwood* reaffirmed that "the education of the Nation's Youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Id.*, at 273, 108 S.Ct. at 571. Thus, a court must defer to reasonable educational decisions made by educators. However, when a particular decision implicating the First Amendment "has no valid educational purpose ... the First Amendment is so 'directly and sharply implicate[d]' as to require

---

7. Although the *Hazelwood* Court concluded that school officials should have great control over curricular expression, that discussion was intended to exempt student expression in a curricular activity from the more stringent standard applied to student speech in noncurricular activities enunciated in *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker*, the court held that a school may not prohibit student expression unless it will materially disrupt the operation of the school. *Id.* at 509, 89 S.Ct. at 738. Therefore the emphasis in *Hazelwood* on control over curricular expression was intended to distinguish the case from *Tinker* and justify the application of the *Cornelius* standard. *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at 570; *see*

*Alabama Student Party v. Student Government Ass'n*, 867 F.2d 1344, 1345 (11th Cir.1989) (*Cornelius* standard applicable to situation where outsiders seek access to school).

Of somewhat more concern is the suggestion by the School Board that *Hazelwood* eliminates the requirement that restrictions on speech in a curricular activity be viewpoint neutral. Although the Supreme Court did not discuss viewpoint neutrality in *Hazelwood*, there is no indication that the Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views. As discussed, *infra, Hazelwood* acknowledges a school's ability to discriminate based on *content* not *viewpoint.*

judicial intervention." *Id.* (citations omitted). With this context in mind, we proceed to review the regulations at issue. First we examine the reasonableness of the two sets of regulations. Then we review the district court's finding that the regulations were adopted to suppress the APA's viewpoint.

## B. Reasonableness

Since Career Day is a nonpublic forum, any restrictions on access must be reasonable in light of the purposes of the forum. The educational purposes of Career Day are evident both from the official policy and the testimony at trial. The initial Career Day policy of 1977 states that the purpose of the program is to enable students "to examine their attitudes, interests, aptitudes and abilities in order to relate them to career opportunities, and to make valid decisions regarding further education and future endeavors." Def. Exh. 6. The more recent policy states that "Career Day is to be a program which allows students to gain career awareness and to explore career opportunities in various fields." Finally, Dr. Crim summed up Career Day in his testimony by stating "[t]he focus that we have on Career Days is helping young people to make decisions as it relates to their occupational opportunities or post-secondary educational opportunities." Record, Vol 11, at 545. Thus, the primary purpose of Career Day is informational; speakers inform the students of the career and educational opportunities available to them. The speakers may talk about the specific requirements of a certain educational program or job and/or the benefits of specific occupations.

Because Career Day and Youth Motivation Day are often combined in a single activity, the program also has a second important goal, namely motivating the students. As explained in the testimony of Dr. Crim, the program also "is focused on raising youth expectations, providing them with the broad spectrum of what different kinds of occupations [there] are." Record, Vol. 11, at 523–24. The type of motivation, like the type of information, which is appropriate depends on the circumstances of the students. Some students need information to make the choice between particular educational opportunities or jobs, while other students need motivation to *stay* in school or find *any* job. *Id.* Thus, the organization of Career Days and Motivation Days was traditionally left to the discretion of the individual schools. However, after the APA sought and was denied access to Career Days and filed suit, the Board adopted a more uniform policy regarding Career Days. The Board argues that the policy and the regulations are reasonable in light of the informational and motivational purposes of the program. We address the reasonableness of the two sets of regulations in turn.

### 1. The Direct Knowledge and Present Affiliation Requirement.

Both the Career Day policy and the Administrative Regulations require that presenters have direct knowledge of the career opportunities about which they speak. Regulation 9 deems a presenter to have direct knowledge "if by virtue of that person's training, education or experience, the presenter possesses sufficient knowledge such that the information to be imparted would be of use and benefit to students in making their career choices and understanding the career options available." The regulation goes on to require each participant to "have some present affiliation or authority with that career field about which he or she is to make a presentation." The district court invalidated the direct knowledge requirement because it was inserted to exclude the APA from appearing at Career Day and because the present affiliation requirement was unreasonable.

On appeal, the Board asserts that this requirement ensures that "a presenter knows what he is talking about," which in turn ensures that the speaker gives credible information and provides a credible role model for the students. In addition, the

government[8] argues that the requirement is justified as a reasonable means of avoiding political debate at Career Day. Both these objectives are legitimate pedagogical concerns of the School Board. Clearly it is vital to the success of the program that the speakers provide useful information and present credible role models. In addition, school officials are entitled to prohibit political or ideological debate at Career Day. Because the program is a nonpublic forum, it is appropriate for the school board to make content based distinctions which serve an educational purpose. The Board concluded that political debate is inconsistent with the purposes of Career Day. *See* Regulation 13 ("It is the intent of Atlanta Board of Education policy ... to preserve the character of the public school forum as primarily educational and not as a forum for public debate on matters of politics, social issues, or other controversial matters.") But the question is not the importance of the school's justifications, but whether the regulations adopted are reasonable means to achieve these goals.

■ We agree with the Board that the *direct knowledge* requirement is reasonably related to ensuring that speakers present credible information and are positive role models. It was reasonable for the Board to conclude that individuals without any specific knowledge of career fields would not present appropriate information. However, as stated by the APA in its brief, "[i]f the 'direct knowledge' requirement meant only what the Board says it means, the APA would not have argued that it was unreasonable. The APA is interested in students learning the truth about military service, and therefore has no quarrel with a rule requiring presenters to know what they are talking about. The problem is

that the Board's direct knowledge requirement includes the requirement that the presenter also have 'some present affiliation with that career field.'" Appellee's brief at 26–27 (citations omitted). It is the *present affiliation* requirement that the district court found unreasonable. We agree.

As the district court noted, the regulation as written would exclude retired persons and professional career counselors from participation in Career Day. Since such individuals have participated in the past, the School Board has acknowledged that they may have valuable information for the students.[9] The Board advances no argument to support this regulation and thus points to no evidence in the record to explain the present affiliation requirement. Nor can we discern how this regulation is related to ensuring a successful Career Day. It is not intuitively obvious that individuals who are no longer affiliated with a career would have less information or would present a less effective role model; nor is it obvious that such an individual would be more likely to turn Career Day into a forum for his or her political views.[10]

Although the Board offers no support for this regulation, the government argues that we must defer to the Board's decision. The government argues that although the decision to exclude retired people from Career Day may not be the wisest choice, a regulation "need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. This argument wrongfully concludes that the regulation is reasonable and overstates the deference a court must pay to School Board decisions. Although the School Board has

8. The United States intervened as a defendant in the district court on behalf of the Armed Services. It initially filed a notice of appeal but voluntarily dismissed that notice of appeal. The government then filed a brief as appellee in support of the judgment below. The government argues that although the district court erred in finding the regulations unreasonable, its finding that the regulations were viewpoint based is not clearly erroneous.

9. We also note parenthetically that this regulation could totally exclude the APA from appearing at Career Day to speak about peace oriented opportunities. Thus we find the Board's representation that it has no quarrel with the APA appearing for this purpose disingenuous.

10. For example, Dr. Foster, the Director of Guidance Counselors, could not say whether a recently disabled veteran could appear at Career Day to discuss the educational benefits he received in the Army. Record, Vol. 11, at 657–59.

the discretion to choose between reasonable alternatives, there is no evidence that the Board made a *choice* in this case. There is no evidence which even arguably explains the Board's change in position; for example, there is no evidence that the Board had experienced any problems with individuals who were not affiliated with a group. We cannot *infer* the reasonableness of a regulation from a vacant record.[11] *See Hazelwood,* 484 U.S. at 275 & n. 8, 108 S.Ct. at 572 & n. 8 (discussing testimony supporting reasonableness of principal's conclusions); *Cornelius,* 473 U.S. at 811, 105 S.Ct. at 3453 (discussing evidence supporting reasonableness of conclusions). Indeed the lack of any evidence to support this regulation and the facts surrounding the adoption of the regulations support the inference that the regulation was written to specifically exclude the APA from Career Day. As explained above, the district court was not clearly erroneous in finding that the School Board intended to suppress the APA's viewpoint. We therefore hold that although the requirement that a presenter have direct knowledge is reasonably related to the purposes of the Career Day program, the present affiliation requirement is unreasonable.

### 2. The No Criticism and No Discouragement Requirements.

■ The Career Day policy and Regulation 11 state that "[p]articipants shall not be allowed to criticize or denigrate the career opportunities provided by other participants." The regulations go on to require that information be conveyed in a positive manner so as to motivate the students. Under Regulations 10 and 11, "[n]o presenter whose primary focus or emphasis is to discourage a student's participation in a particular career field" may participate in Career Day. The district court found the no criticism ban unreasonable because the school officials had acknowledged the value

of both positive and negative information to students making decisions about their future. The court found the regulation prohibiting participation of those whose primary focus is to discourage students from a particular field to be reasonable in light of the motivational purposes of the forum, but since the court found that all the regulations were written in order to suppress the APA's viewpoint, even that regulation was unconstitutional.

The Board justifies both these regulations as reasonably related to motivating the students to set goals. We agree that the regulation prohibiting a group whose sole purpose is discouraging students from an occupation or educational opportunity is reasonable. Discouraging students from participating in a particular field clearly detracts from the motivational purpose of the forum. It is the total banning of a group from the forum—rather than limiting what a group can say—that we find to be unreasonable.

As the district court noted, since the main purpose of Career Day is to allow students to evaluate their opportunities for the future, presenting only positive information directly conflicts with the educational purpose of the forum. The fact that speakers at previous Career Days have been able to criticize the paths urged by other speakers reflects that the policy of the Board has always been, in the words of Dr. Crim, "to provide [the students] with an optimum level of information." Record, Vol 11, at 618. Both Dr. Crim and Dr. Foster, the Director of the Guidance Counselors, testified that students should receive as much factual information as possible when making decisions about their future. *Id.* at 548, 653. We agree with the district court that "[i]t is almost axiomatic that a valid decision is one made after weighing pros and cons. Students certainly cannot be expected to make important

---

11. In its reply brief, the appellant attempts to explain its failure to present evidence to justify the regulation by pointing out that the regulations were written *after* trial and the record was not reopened for presentation of new evidence. This argument ignores the fact that the regulations were only intended to interpret the general

policy. In addition, the district court made it clear that he could not rule without considering the regulations. Thus the defendants were on notice that they should present all evidence to support the direct knowledge requirement at trial.

career choices based only on positive information." 681 F.Supp. at 829. This applies with special force when one is making a decision about a career in the military because unlike other dissatisfied employees, a soldier cannot quit. The testimony of Admiral Larocque reiterates this obvious point. He testified, "[t]he services would be stronger, we would have greater security as a nation if these young people knew what they were getting into and then wholeheartedly supported it while they were in the service. Some people are simply not suited to military life, but it is too late to find out once you get in." Record, Vol. 8 at 111.

On appeal the Board argues that the district court erroneously rejected its argument that negative information might detract from the motivational purpose of the forum. The Board argues that both Dr. Crim and Dr. Foster testified that the students would not be able to handle receiving both positive and negative information. *See* Record, Vol. 11, at 546–47; 642–43. The Board contends that this evidence supports the reasonableness of the decision to ban criticism.

We disagree. During cross-examination, both Dr. Crim and Dr. Foster clarified their positions by stating that students should receive factual information about a job opportunity even if it were negative.[12] On cross-examination, Dr. Crim revealed that his real concerns about the students' ability to understand the critical information was related to the possibility that the information would be misused by speakers. First, Dr. Crim was concerned that allowing criticism would result in the discussion of con-

troversial social issues at Career Day.[13] As we held, *supra*, the Board can legitimately exclude discussion of controversial matters from Career Day. In doing so, the Board merely ensures that the forum is used for its intended purpose—conveying information about jobs and other opportunities. However, while avoiding controversial issues justifies prohibiting speakers from discussing the morality of war or defense spending, it does not justify excluding bona fide negative facts which are relevant to the requirements or benefits of a specific job, including one in the military. Dr. Crim acknowledged this by agreeing that the APA or any group could tell the students (if it were documented) that soldiers were underpaid. Dr. Crim stated, "That would be a fact related to the job benefits. Certainly, it would be appropriate to speak to pay and other work conditions and the like. Certainly, any person representing any occupational organization would convey that kind of information." Record, Vol. 11, at 608.

Dr. Crim was also concerned that negative information could be conveyed in a pejorative manner to discourage students from considering certain fields. If this were the case, it would clearly be at odds with the purposes of Career Day. For example, although Dr. Crim generally agreed that information contained in pamphlets prepared by the APA which gives advice about the recruitment process was appropriate for students, he considered some of the statements in the pamphlet negative or pejorative. *See* Record Vol. 11, at 596–99, 610–12. This concern, however, does not justify a ban of *all* critical infor-

---

**12.** For example, Dr. Crim testified that it would be appropriate for students to be told (if it were true) that people in certain jobs were underpaid. Record, Vol. 11, at 608. Dr. Foster agreed that negative information was valuable to the students when making decisions, but that the information should be given to the students by guidance counselors. If this were the case, it would greatly enhance the reasonableness of the regulations. *See Perry,* 460 U.S. at 53, 103 S.Ct. at 959 (reasonableness of limitation on access supported by the substantial alternative channels that remain available for communication). However, the testimony does not reflect that guidance counselors are giving students this in-

formation. In fact, both Dr. Foster and Dr. Crim's testimony reveals that the workload of the typical guidance counselor makes "it almost impossible for a counselor assigned 400 to one to have individual counseling with all students...." Record, Vol. 11, at 649.

**13.** For example, Dr. Crim agreed that information about racism or sexism in the military might be useful to the students but that issue of that controversial nature should be discussed in a more controlled and balanced setting such as a Social Studies class. Record, Vol. 11, at 607–08.

mation including the information Dr. Crim acknowledged was helpful to the students. Instead, it justifies only prohibiting the use of critical information to denigrate a profession and discourage students from that field. Finally, Dr. Crim was concerned that speakers would use negative factual information in a misleading or inaccurate manner.[14] That concern, however, does not justify banning criticism entirely. Dr. Crim's concern about perjorative information is addressed by the district court's order, which allows the schools to exclude any inaccurate or misleading information from Career Day.

Thus, the regulations banning criticism are only reasonable to the extent that they prohibit a group from denigrating the opportunities offered by a specific group. The regulations are unreasonable to the extent that they prohibit a group from presenting negative factual information about the disadvantages of specific job opportunities because such information is useful to students making decisions about careers. Moreover, the Board could not allow speakers to point out the advantages of a particular career but ban any speaker from pointing out the disadvantages of the same career. That amounts to viewpoint-based discrimination which is prohibited by the First Amendment regardless of the type of forum. We turn now to that issue.

### C. Viewpoint-based Discrimination

■ "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius,* 473 U.S. at 811, 105 S.Ct. at 3454. In a nonpublic forum, the government may limit the subject matter discussed by all speakers in a forum but it may not distinguish between particular speakers based on their view of the approved subject matter. As the *Cornelius* Court stated "[a]lthough a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encom-

passed within the purpose of the forum, ... or if he is not a member of the class of speakers for whose especial benefit the forum was created, ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses or an otherwise includable subject." 473 U.S. at 806, 105 S.Ct. at 3451; *see also Perry,* 460 U.S. at 62, 103 S.Ct. at 964 (Brennan, J., dissenting) ("We have never held that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic, even if the government for certain reasons may entirely exclude discussion of the subject from the forum.") Thus, as with any other nonpublic forum, once the School Board determines that certain speech is appropriate for its students, it may not discriminate between speakers who will speak on the topic merely because it disagrees with their views. *Cornelius,* 473 U.S. at 811, 105 S.Ct. at 3454; *MNC,* 791 F.2d at 1475; *see San Diego Committee Against Registration and the Draft v. Governing Bd. of Grossmont Union High School Dist.,* 790 F.2d 1471, 1581 (9th Cir. 1986) (by allowing military to place ads in school paper but not allowing ads by those opposed to military service, school officials engaged in viewpoint discrimination); *cf. Estiverne v. Louisiana State Bar Ass'n,* 863 F.2d 371, 382 n. 17 (5th Cir.1989) (Bar Journal's refusal to print attorney's version of disciplinary problem was content based restriction not viewpoint based since Journal published no attorneys' responses and Journal expressed no viewpoint on disciplinary proceedings).

The Board argues that *Hazelwood* does not prohibit school officials from engaging in viewpoint based discrimination. We disagree. *Hazelwood* involved a content based distinction; the principal decided that the subject of teenage sexuality was inappropriate for some of the younger students. *Id.* at 274–76, 108 S.Ct. at 571–72. There was no indication that the principal

---

14. When asked whether a presenter could inform students that black and Latinos have less chances of getting a high-tech job in the military, Dr. Crim stated, "If *anyone* were to say

that, and that is documented by fact, that would be useful for the student." Record, Vol. 11, at 617 (emphasis added).

was motivated by a disagreement with the views expressed in the articles. Although *Hazelwood* provides reasons for allowing a school official to discriminate based on *content*, we do not believe it offers any justification for allowing educators to discriminate based on viewpoint. The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis. *Perry*, 460 U.S. at 62, 103 S.Ct. at 964 (Brennan, J., dissenting). *See, e.g., Cornelius*, 473 U.S. at 812–13, 105 S.Ct. at 3454–55 (on remand, respondents free to argue that regulations were viewpoint based). Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral. *See Virgil v. School Board of Columbia County*, 862 F.2d 1517, 1522–23 & n. 6 (11th Cir.1989) (viewpoint neutrality test applies to First Amendment claim concerning removal of books from curriculum).

In this case, the School Board has determined that the students should learn about career and educational opportunities. Having done so, the Board cannot exclude the APA solely because it disagreed with the APA's views about the career choices students should make. More specifically, the Board cannot exclude the APA because it disagreed with its views about the military. The district court found that the Board was motivated by its disagreement with the APA's views. This finding of fact is only reversible if it is clearly erroneous. A finding is not clearly erroneous unless "the reviewing court ... is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Moreover, the finding is not clearly erroneous so long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

As the district court noted, there is no doubt that the Board's abrupt change in policy was caused by the APA's request for access to schools. The procedure by which the policy was adopted is an important factor in deciding whether the Board engaged in viewpoint based discrimination. *See MNC*, 791 F.2d at 1475. In this case, the Board's treatment of the APA supports an inference that the Board intended to suppress the APA's views. In addition to the evidence relied on by the district court, we note two additional factors which also support the district court's finding. First, one of the Board's justifications for limiting access—avoiding debate about controversial matters—although facially reasonable is capable of concealing bias towards the approach advocated by specific speakers. If the School Board disagreed with the APA's views about careers, it could easily label them "controversial" and thus exclude them from the program. *See Cornelius*, 473 U.S. at 812, 105 S.Ct. at 3454 (noting that facially reasonable justification of avoiding controversy is capable of concealing viewpoint bias). In addition, as we pointed out above, there are doubts as to the genuineness of the Board's justifications based on past practice. *Cornelius*, 473 U.S. at 812, 105 S.Ct. at 3454; *see Student Coalition for Peace v. Lower Merion School*, 776 F.2d 431, 437 (3d Cir. 1985). For example, although the Board policy now eschews criticism of other participants and political debate, the record reflects that in addition to giving their views about the path to success, speakers have been free to criticize the approach advocated by other presenters and speakers have discussed such controversial topics unrelated to job opportunities as defense spending without any censure. *See, e.g.,* Record, Vol. 9, at 232–34, 280; Vol. 10, at 365–66. These factors strengthen the district court's finding that the Board enacted these regulations to suppress the APA's viewpoint.

## III. CONCLUSION

Plaintiffs were excluded from a forum established by the Atlanta School Board for the purpose of encouraging members of the public to participate in Motivation and Career Days. The chief objective of Career Days was to inform students of the advantages and disadvantages of various job and

career opportunities. Plaintiffs' participation in the forum was initially approved by then Superintendent of Schools Crim. Upon learning of this, the School Board denied plaintiffs access to the forum for the reason of plaintiffs' viewpoint toward the military.

After learning that the First Amendment permitted plaintiffs' involvement in the forum, the School Board adopted regulations governing content of speech and eligibility of speakers. The district court correctly perceived that some of these regulations were designed to either directly or indirectly deny plaintiffs' participation in the forum. We affirm the district court's judgment with some slight modifications.

With respect to Regulation 9, we reverse the district court's order insofar as it struck the entire regulation. The first sentence which requires that the speakers have knowledge of the subject addressed is an appropriate content restriction. We agree with the district court that the "present affiliation" regulation is unduly restrictive and the district court's striking of the last sentence of Regulation 9 is affirmed.

The district court struck the last sentence in Regulation 10 (the no discouragement ban) and the first sentence of Regulation 11 (the no criticism, no denigration ban). We affirm the district court with some modification, but agree with that court's reasoning set forth at 681 F.Supp. 821, 829–30. To the extent that a speaker is discouraging a student from entering a specific career by providing students with valid and informative disadvantages of that career, this is appropriate and allowable. To the extent a speaker discourages students from entering a specific career by denigrating that career because of its nature or purpose of the career, the administrator of the program can ban such speech. Stated another way, accurate information about a career that some might take as criticism of the career or as discouragement of students from entering that career is permissible. On the contrary, exhortative and denigrative presentations by speakers for the purpose of denouncing certain careers for the purpose which they serve may properly be banned. We do not believe the parties or any persons in the future who seek to participate in career programs can misunderstand what is and is not permissible. We affirm the district court's rulings with respect to Regulations 10 and 11, given the interpretations herein made.

In conclusion, we affirm the district court except we reinstate the first sentence of Regulation 9, we reinstate the final sentence in Regulation 10, explain the limitations on "discourage" contained therein, and on the words "criticism" and "denigrate" in Regulation 11.

AFFIRMED AS MODIFIED.

## APPENDIX

## CAREER DAY PROGRAM

### Administrative Regulations

1. Any person, firm, group or organization wishing to participate in the Career Day program should initiate its contact with the school principal.

2. Any Career Day program or its presenter(s) must have the prior approval of the school principal.

3. Any person, firm, group or organization wishing to participate in the school Career Day program must provide information to the school principal, in a form and format satisfactory to that principal, of the purpose/goals/objectives/content of the proposed Career Day program offering. The request for Career Day program participation may be denied by the school principal if curricular relevance is not identifiable within the purpose/goals/objectives/content of the program as presented.

4. In making the determination as to the curricular relevance of the proposed Career Day program presentation, the school principal or his designee may request and review any written or printed information which the presenter desires to distribute during the Career Day program. Principals are encouraged to utilize the services of the school guidance counselor in making the determination of curricular relevance and any necessary or desired review or evaluation thereof.

5. Any organization wishing to participate in a school's Career Day program must give sufficient notice of that desired participation to the school principal such that staff/student orientation, supervision, scheduling and space can be arranged for the Career Day program.

6. Requests for Career Day program participation are considered to be more timely when presented in mid-August such that activities can be included in the annual and/or guidance calendar.

7. Any person, firm, group or organization desiring to participate in a school's Career Day program, whose request for participation is denied by the school principal, may appeal that denial of such participation or any restrictions placed upon such participation by the school principal to a Central Career Day Committee to be chaired by the individual responsible at a central level for supervision of school guidance counselors, presently the Coordinator of Staff Support Services who is responsible for guidance and counseling services. Any party aggrieved by a principal's decision concerning Career Day participation may appeal such decision by filing a written request for appeal with the Coordinator of Staff Support Services who is responsible for guidance and counseling services within ten (10) days after notification of the principals' decision. Such appeal committee shall also consist of one high school principal selected annually by the committee chairperson and one guidance counselor to be selected annually by the committee chairperson. Both the Assistant Superintendent for Curriculum and Research Services and the Director of the Staff Support Services shall be ex officio members of the Central Career Day (Appeal) Committee and shall be notified of and have the right to participate in any pending appeal and the determination thereof. In the event a member of the appeal committee shall have made or participated in the decision appealed from, the chairperson may appoint a replacement member for purposes of the appeal. Such appeal committee may review any documentation concerning the re-quest, may interview any witness or witnesses it deems appropriate and shall make its decision in writing within thirty (30) days after written appeal is filed with the Coordinator of Staff Support Services. All interested parties shall be provided a copy of the decision of the appeal committee.

8. Each person, group, firm or organization participating in school Career Day programs shall be given a copy of the Atlanta Board of Education's policy on "Career Day Program (Code IDD)" and these accompanying administrative regulations prior to the program. Each participant shall be expected to follow the directives of such policy and administrative regulations in its presentation to students. In the event any person, firm, group or organization shall violate the policy or these regulations, appropriate disciplinary action shall be imposed upon such participant by the Central Career Day (Appeal) Committee, after appropriate review and right of the offender to be heard, as it deems appropriate, including the barring of that person's, firm's, group's or organization's further participation in school Career Day programs altogether.

9. Presenters at a school Career Day program shall be deemed to have direct knowledge of the career opportunities about which they speak if, by virtue of that person's training, education or experience, the presenter possesses sufficient knowledge such that the information to be imparted would be of use and benefit to students in making their career choice and in understanding the career options available. Each presenter and Career Day program participant shall have some present affiliation or authority with that career field about which he or she is to make a presentation.

10. Information concerning career fields shall be deemed appropriate if it is in form and format such that, in the opinion of the school principal, with appropriate consideration given to the opinions and input from the school guidance counselor, the information is understandable by students and of use to students in making career choice or in understanding the career options avail-

able. Each participant shall be allowed to and expected to provide full and complete, factual and objective information about the applicable career field to students. Such information shall be conveyed in a positive and encouraging a manner as possible so as to be motivational to students. No presenter whose primary focus or emphasis is to discourage a student's participation in a particular career field shall be allowed to participate in school Career Day programs.

11. Participants in school Career Day programs shall not be allowed to criticize or denigrate the career opportunities provided by other participants. Information provided to students at school Career Days shall be positive information regarding the career opportunities available, shall motivate students to continue their education and to consider their pursuit of the applicable career field and shall provide encouragement to students concerning the career fields at issue. While participants are expected to provide full and complete, factual, objective and accurate information concerning career fields about which they speak, no participant whose primary focus or emphasis is to discourage students from such career participation shall be allowed to participate. Encouraging student participation in a particular field, while in and of itself discouraging participation in other career fields, shall not be deemed to be criticism within the meaning of Board policy or these regulations.

12. These regulations concerning Career Day program materials shall apply both to oral presentations and to any written material to be distributed at school Career Day.

13. It is the intent of Atlanta Board of Education policy concerning Career Day programs and these administrative regulations to preserve the character of the public school forum as primarily educational and not as a forum for public debate on matters of policies, social issues, or other controversial matters.