Rehearing en banc granted by order filed 12/3/96 --
published opinion filed 10/31/96 is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MARGARET BORING,
Plaintiff-Appellant,

v.

THE BUNCOMBE COUNTY BOARD OF
EDUCATION; CHARLES JOHNSON,
Chairman; MICHAEL ANDERS; TERRY

ROBERSON; BRUCE GOFORTH; BILL
WILLIAMS; GRACE BRAZIL; WENDELL
BEGLEY; DR. J. FRANK YEAGER,
Superintendent; FRED IVEY,
Principal; each in his/her individual
and official capacity,
Defendants-Appellees.

No. 95-2593

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-93-230)

Argued: May 7, 1996

Decided: October 31, 1996

Before WIDENER, MURNAGHAN, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Motz wrote the
majority opinion, in which Judge Murnaghan joined. Judge Widener
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Leon Dayan, BREDHOFF & KAISER, Washington, D.C., for Appellant. Jim D. Cooley, WOMBLE, CARLYLE, SAND-RIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Jeremiah A. Collins, BREDHOFF & KAISER, Washington, D.C.; S. Luke Largess, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellant. W. Clark Goodman, WOMBLE, CARLYLE, SAN-DRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellees.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

In this case, a high school drama teacher appeals the dismissal of her complaint for failure to state a claim. The district court determined from the face of the teacher's complaint that the First Amendment did not protect her conduct in selecting, producing, and directing a play that her drama students performed. Although the First Amendment affords a teacher only limited refuge in this context, we conclude that it does not leave a teacher so completely without protection that her complaint failed to state a claim. Accordingly, we reverse and remand for further proceedings.

I.

Because this case was dismissed for failure to state a claim, we must accept the following facts, as alleged in the plaintiff 's complaint, as true. See Hishon v. King & Spalding , 467 U.S. 69, 73 (1984); Advanced Health-Care Servs., Inc. v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990).

During the 1991-92 school year, Margaret Boring was employed as a teacher of English and Drama at the Charles D. Owen High School in Buncombe County, North Carolina. The County had employed Boring as a teacher since 1979 and, in that time, she had "built a

national reputation for excellence in teaching drama and directing and producing theater." Plays she produced won numerous awards and many of her students received theater-related scholarships to college, including $260,000 in awards to 1992 graduates.

In the fall of 1991, Boring chose "Independence" as the play for four student-actresses in her advanced acting class to perform. "Independence" is a drama that "powerfully depicts the dynamics within a dysfunctional, single-parent family -- a divorced mother and three daughters; one a lesbian, another pregnant with an illegitimate child." The students planned to perform the play, under Boring's direction, in a state competition. After selecting the play, Boring notified the school principal, as she did every year, of her choice. The principal, Fred Ivey, did not comment or react.

Before rehearsals began, Boring sent the four student-actresses home with scripts to discuss the play with their parents. None of their parents complained, then or later, about the content of the play. The students then performed "Independence" in a regional competition, in which the play won seventeen of twenty-one possible awards.

After the regional competition, but before the state finals, controversy erupted. A student-actress in "Independence" spoke enthusiastically about the play during an English class, taught by Donna Wyles. In response to complaints about the tedium of reading plays, the student remarked that plays were best appreciated when performed, rather than read, and suggested that the English class view a scene from "Independence." Wyles approached Boring and asked if the drama students could perform a scene for Wyles' class. Boring agreed, but asked Wyles to ensure that her students obtained permission slips from their parents before the performance. Wyles assented to Boring's request.

The drama students then performed a scene from "Independence" in the English class. Afterwards, a student in the class, who apparently had not obtained his parents' permission to see the performance, described the scene to a parent. The parent complained to Ivey, who asked to see a copy of the script. Upon reading the script, Ivey informed Boring and the student-actresses that they would not be permitted to perform the play in the state finals.

3

Boring asked Ivey and County School Superintendent Dr. J. Frank Yeager to watch a performance of the play before forbidding its entry in the state finals. They declined, refusing even to permit the students to use the school's theater to perform the play for the students' parents. After the play was performed instead in a parent's home, the parents pleaded with Ivey to reconsider his decision. Ivey relented but insisted that certain scenes be deleted. "Independence" then won second place in the state finals.

On June 2, 1992, Boring received her performance evaluation for the year; she was rated "superior" and "well above standard" in all function areas, including "Interacting in the Educational Environment" and "Performing Non-Instructional Duties." Nevertheless, ten days later, on June 12, Principal Ivey requested Boring's transfer from Owen High School. Superintendent Yeager agreed and approved Boring's transfer to a middle school where she was assigned to teach introductory drama. Boring appealed her transfer to the Board of Education of Buncombe County. After a hearing, the Board denied her appeal and upheld the transfer.

Boring initially filed suit in state court, alleging that the Board members, Ivey, and Yeager, each in their individual and official capacities, (collectively, "the defendants"), violated several of her rights under the state and federal constitutions. Boring asserted that the defendants transferred her "in bad faith and with malice toward [her] over the ideas expressed in the play" and so violated her right to freedom of expression. Boring alleged that the transfer caused her "emotional distress, personal and professional humiliation, . . . bludgeoned her reputation as an educator, and . . . caused her to lose professional opportunities."

Defendants removed the case to federal court and, before filing an answer, moved to dismiss the complaint for failure to state a claim. A magistrate judge agreed with the defendants and recommended dismissal. The district court accepted the magistrate judge's recommendation and dismissed all of Boring's claims.

Boring only appeals the dismissal of her First Amendment claim, which the district court rejected for two reasons. First, the court held that Boring's selection of a play to produce and direct did not consti-

4

tute a form of "expression" or "speech" that the First Amendment protected. Second, the court ruled that, even if selecting "Independence" was protectable "speech," the school authorities "had a legitimate interest in curbing such speech," and therefore Boring's selection fell outside any First Amendment protection.

We review de novo dismissals for failure to state a claim. Martin Marietta Corp. v. International Tel. Sat. Org., 991 F.2d 94, 97 (4th Cir. 1992). Only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" will we affirm such a dismissal. Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

II.

We initially address the two grounds on which the district court based its decision to dismiss Boring's complaint.

A.

First, the district court agreed with the magistrate judge that Boring's complaint did not state a cause of action because she had not alleged that the defendants sanctioned her for ideas she expressed, but rather for ideas the play expressed. The court thus held that Boring's mere "implicit approval" of the ideas in the play "was not expressive conduct entitled to constitutional protection."

In reaching its conclusion, the district court relied primarily on Judge Milburn's concurring opinion in Fowler v. Board of Education, 819 F.2d 657 (6th Cir.) (Milburn, J., concurring), cert. denied, 484 U.S. 986 (1987). Of the three opinions the Sixth Circuit panel issued in Fowler, two concluded that the conduct at issue in the case -- a teacher's presentation of a film to her class -- constituted protectable "expression." Fowler, 819 F.2d at 667 (Peck, J., concurring); 819 F.2d at 669 (Merritt, J., dissenting). Judge Milburn reached a different conclusion. After analyzing the film presentation under legal principles applicable to conduct not "inherently expressive," he found the teacher's conduct unprotected. Id. at 662-64. Largely because the teacher was apparently unaware of the film's content, Judge Milburn

5

concluded that her failure to establish that she intended to convey a particularized message to her class deprived her conduct of First Amendment protection. Id. at 663. Judge Milburn's rationale appears inapposite here because nothing in this record suggests that Boring was unaware of the play's content.

Moreover, and more importantly, we disagree with Judge Milburn's analysis in Fowler. The legal principles applicable to conduct not "inherently expressive" simply do not apply to a teacher's film presentation or Boring's conduct in selecting, directing, and producing a play. Films, plays, and even "crude street skits," constitute inherently expressive communicative vehicles and, as such, warrant First Amendment protection even if the speaker cannot establish an intent to convey a particularized message. Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386, 391 (4th Cir. 1993); see also Schad v. Borough of Mt. Ephraim , 452 U.S. 61, 65 (1981) ("motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and drama works, fall within the First Amendment guarantee"). Thus, to state a claim Boring need not establish that she "explicitly approved" the ideas in the play or that she intended to convey a particularized message through her choice of "Independence."

To the extent the district court held that Boring's conduct did not merit protection because she did not express ideas of her own, but only the ideas expressed in the play, the court also erred. The First Amendment's protection extends beyond original expression. As recently as 1995, the Supreme Court explained that the First Amendment protects speech, regardless of whether the speaker originally generates the communication or personally advocates the ideas contained therein:

> [U]nder our precedent, . . . First Amendment protection [does not] require a speaker to generate, as an original matter, each item featured in the communication. Cable operators, for example, are engaged in protected speech activity even when they only select programming originally produced by others. For that matter, the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages, which, of

6

course, fall squarely within the core of First Amendment security, as does even the simple selection of a paid non-commercial advertisement for inclusion in a daily paper. The selection of contingents to make a parade is entitled to similar protection.

Hurley v. Irish-American Gay, Lesbian & Bisexual Group, ___ U.S. ___, ___, 115 S. Ct. 2338, 2345-46 (1995) (citations omitted).

Just as selection of the above items constitutes protectable expression, so too a teacher's selection of a play for her class to perform constitutes such expression. See Webb v. Lake Mills Community Sch. Dist., 344 F. Supp. 791 (N.D. Iowa 1972) (teacher's play selection protected); cf. Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969) (teacher's selection of a magazine article for an English class protected); Parducci v. Rutland, 316 F. Supp. 352 (M.D. Ala. 1970) (teacher's selection of a text protected).

Accordingly, the district court erred in concluding that Boring's play selection was not protectable "expression," and dismissing her complaint on this ground.

B.

The district court alternatively concluded that even if selection of a play constituted a form of expression that could be protected, Boring's choice of "Independence" did not merit protection. The court reached this alternative holding in reliance on the standard articulated in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). In Hazelwood, the Supreme Court held that a school could restrict student speech if the restriction was "reasonably related to legitimate pedagogical concerns." Id. at 273. Purportedly applying that standard to Boring's complaint, the district court ruled, without elaboration, that defendants had a "legitimate interest in curbing" Boring's conduct in selecting "Independence."

Boring does not challenge the district court's determination that Hazelwood supplies the appropriate legal standard in this case; she challenges only the court's application of that standard. Accordingly,

7

for the moment (although we will discuss this issue in detail later), we will assume that Hazelwood, which examined student speech, also states the appropriate standard for analyzing restrictions on teacher classroom speech. The question then becomes whether simply by examining Boring's complaint a court can determine that the defendants' asserted restriction on her speech was "reasonably related to legitimate pedagogical concerns."

The answer is clear: Boring's complaint tells us nothing about the defendants' "legitimate pedagogical concerns" for restricting her speech. A court, therefore, has no basis for determining whether the restriction reasonably related to such concerns; and Boring specifically alleges that it did not.

At present, all we know about the play must be inferred from the limited description contained in the complaint, i.e., "it powerfully depicts the dynamics within a dysfunctional single-parent family -- a divorced mother and three daughters, one a lesbian, another pregnant with an illegitimate child." Such a brief description, in and of itself, cannot establish the play's unsuitability for high school students, or establish that the school's speech restriction necessarily related to legitimate pedagogical concerns. After all, from similar brief descriptions, many of the classics, and even parts of the Bible, might not appear suitable for high school students to study or perform. See, e.g., Judges 16:17-19 (story of Samson and Delilah); 1 Kings 21:8-14 (Jezebel); 2 Samuel 11:1 -12:24 (David and Bathsheba); Giovanni Boccaccio, Tales from the Decameron (R. Adlington trans., 1930); Thomas Bullfinch, Bullfinch's Mythology (Crowell 1834, reprinted, Harper & Row 1970); Homer, The Iliad (Alston H. Chase et al. eds., Little, Brown & Co. 1950); William Shakespeare, Hamlet (G.R. Hibbard ed., The Oxford Shakespeare 1987); Sophocles, Oedipus Rex (David Grene trans., 1954).

In assessing whether Boring's complaint states a claim, we note that a "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." See 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 2d § 1357 (1990). It is "only in the unusual case where the complaint on its face reveals some insuperable bar to relief that dismissal under Rule 12(b)(6) is warranted." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1984)

8

(quotation omitted). This is hardly that "unusual case." Indeed, defendants have not cited, and we have not found, a single instance in which any court has applied <u>Hazelwood</u> to dismiss a teacher's complaint for failure to state a claim. Uniformly, courts have required school administrators to establish their legitimate pedagogical concerns either by affidavit or at trial. <u>See, e.g.</u>, <u>Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.</u>, 42 F.3d 719 (2d Cir. 1994) (case resolved at summary judgment stage), <u>cert. denied</u>, 115 S. Ct. 2612 (1995); <u>Ward v. Hickey</u>, 996 F.2d 448 (1st Cir. 1993) (jury verdict); <u>Miles v. Denver Public Schs.</u>, 944 F.2d 773 (10th Cir. 1991) (summary judgment); <u>Bishop v. Aronov</u>, 926 F.2d 1066 (11th Cir. 1991) (same), <u>cert. denied</u>, 505 U.S. 1218 (1992); <u>Borger v. Bisciglia</u>, 888 F. Supp. 97 (E.D. Wis. 1995) (same).

Although defendants may have had legitimate pedagogical reasons for restricting Boring's speech, none has been established on this record. Without any basis for determining the defendants' intent in transferring Boring, other than Boring's allegation that it was done "in bad faith and with malice toward [her] over the ideas expressed in the play," the district court should not have dismissed the complaint on the theory that the asserted restriction necessarily related to legitimate pedagogical concerns.

III.

In apparent anticipation that the district court's grounds for dismissal might not stand, defendants offer two other arguments to support the district court's decision to dismiss the complaint. First, and principally, they argue that the <u>Hazelwood</u> standard alone provides an inadequate basis for evaluating Boring's claim.

Defendants maintain that a teacher must initially establish that her speech related to a "matter of public concern" before the burden shifts to school authorities to justify restrictions on that speech. <u>See Connick v. Myers</u>, 461 U.S. 138, 150 (1983). To satisfy the "public concern" requirement, the defendants further argue that a teacher must show that she expressed her views in her role as a private citizen, rather than as a government employee. <u>See Kirkland Northside Indep. Sch. Dist. v. Cooper</u>, 890 F.2d 794, 798-99 (5th Cir. 1989) (a statement is "of public concern" and protected if "the words or conduct are con-

9

veyed by the teacher in his <u>role as a citizen</u> and not in his <u>role as an employee</u>"). Thus, because Boring selected the play in her role as a teacher, defendants contend that she cannot possibly satisfy the "public concern" requirement. For the reasons that follow, we believe that these arguments must be rejected.

First, the <u>Connick</u> "public concern" analysis simply does not provide a very useful tool when analyzing a teacher's classroom speech. Requiring a teacher to establish that her in-class speech relates to a matter of public concern adds little, except an extra step to the analysis. The fact is, in most instances, the essence of a teacher's role in the classroom, and therefore as an employee, is to discuss with students issues of public concern. <u>See</u> Gregory A. Clarick, Note, <u>Public School Teachers and the First Amendment: Protecting the Right to Teach</u>, 65 N.Y.U. L. Rev. 693, 702 (1990). Accordingly, most teacher comments fall within the Supreme Court's broad definition of "public concern," which includes speech on "<u>any</u> matter of political, social or other concern to the community." <u>Connick</u>, 461 U.S. at 146 (emphasis added). Certainly, Boring's choice of "Independence," a play allegedly involving a variety of social themes, meets this criterion. <u>Cf.</u> <u>Blum v. Schlegel</u>, 18 F.3d 1005 (2d Cir. 1994) (teacher's comments, including use of hypotheticals in class advocating drug legalization, constituted speech of "public concern").

Moreover, as we noted in <u>Berger v. Battaglia</u>, 779 F.2d 992, 998-99 (4th Cir. 1985), <u>cert. denied</u>, 476 U.S. 1159 (1986), "[t]he principle that emerges [from <u>Connick</u>] is that all public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely `personal concern' to the employee -- most typically, a private personnel grievance." Whatever may be said about Boring's selection of "Independence," or a teacher's choice of a film or course material, they hardly appear analogous to private personnel grievances.

Furthermore, we must reject defendants' argument that Boring's "role" in speaking dictates whether she is entitled to First Amendment protection. To accept this argument would mean a teacher lacks <u>all</u> First Amendment protection whenever she teaches, because by defini-

10

tion she is then acting in her role as a government employee. <u>Connick</u>, upon which defendants so heavily rely, does not support this holding.

In <u>Connick</u>, the Supreme Court did not state, let alone hold, that <u>whenever</u> government workers speak as "employees," their speech deserves <u>no</u> protection. Rather, the Court held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147-48. Thus, although the Supreme Court has on many occasions remarked on the government's greater ability, as employer rather than sovereign, to restrict speech, <u>see, e.g.</u>, <u>Waters v. Churchill</u>, ___ U.S. ___, ___, 114 S. Ct. 1878, 1886 (1994) (plurality opinion), it has not suggested that the speech of government workers, when speaking as employees, can be restricted without <u>any</u> limitation.

Moreover, in view of the importance of the free exchange of ideas in educating our society, such a holding would be particularly ill-advised when the employee is a teacher. The Supreme Court has long recognized that educational institutions occupy a unique place in First Amendment jurisprudence. Hence, the notion that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is "fantastic," <u>see Scallet v. Rosenblum</u>, 911 F. Supp. 999 (W.D. Va. 1996), and stands in direct contrast to an imposing line of precedent. <u>See Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503, 506 (1969) ("the unmistakable holding of this Court for almost 50 years" has been that "First Amendment rights, applied in light of the special characteristics of the school environment are available to <u>teachers</u> and students") (emphasis added); <u>Keyishian v. Board of Regents</u>, 385 U.S. 589, 603 (1967) (A teacher's freedom of speech is a "special concern of the First Amendment"); <u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our society will stagnate and die."); <u>Blum</u> , 18 F.3d at 1012 (First Amendment provides a degree of protection to teacher classroom speech); <u>Ward</u>, 996 F.2d at 452 (same); <u>Miles</u>, 944 F.2d at 775-77 (same); <u>Dube v. State Univ.</u>, 900 F.2d 587, 598 (2d Cir. 1990) (same), <u>cert. denied</u>, 501 U.S. 1211 (1991); <u>Kingsville</u>, 611 F.2d at 1113 (same); <u>Minarcini v. Strongsville City Sch. Dist.</u>, 541 F.2d 577, 582

11

(6th Cir. 1976) (same); James v. Board of Educ. , 461 F.2d 566, 575 (2d Cir. 1972) (same), cert. denied, 409 U.S. 1042 (1972); Keefe, 418 F.2d at 361-62 (same); Krizek v. Board of Educ. , 713 F. Supp. 1131, 1137-43 (N.D. Ill. 1989) (same).

The Supreme Court's often quoted Keyishian opinion provides perhaps the most memorable modern articulation of the special role of free speech in educational institutions. In Keyishian, the Court held that a statute and regulations requiring teachers to swear that they had never advocated treasonable or seditious acts were unconstitutionally vague. One of the regulations required an annual review of teachers' utterances and acts "inside the classroom or out." Keyishian, 385 U.S. at 602 (emphasis added). In striking down the provisions, the Court explained:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the "marketplace of ideas."

Id. at 603 (citations omitted).

Thus, in Keyishian, by holding unconstitutional regulations covering teachers' speech both inside and outside the classroom, the Supreme Court strongly indicated that teacher in-class speech merits First Amendment protection. See also Tinker, 393 U.S. at 506 ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.") (emphasis added). Cf. Epperson v. Arkansas, 393 U.S. 97 (1968) (striking down law forbidding the teaching of evolution on religious establishment grounds); Meyer v. Nebraska, 262 U.S. 390 (1923) (striking down law criminalizing teaching in any language other than English based on teacher's due process liberty right to teach).

12

This circuit, following Supreme Court direction, similarly has indicated that a teacher's in-class speech, although by definition communicated while the teacher acts as an employee, deserves constitutional protection. See Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1081 (4th Cir. 1987) (a teacher's right to free speech outweighed the school's interest in restricting his speech; we noted specifically that the teacher's use of class time to discuss the issue in question "add[ed] up to an exercise of first amendment rights in which both [the teacher] and the community were vitally interested"), cert. denied, 487 U.S. 1206 (1988); see also Moore v. Gaston County Bd. of Educ., 357 F. Supp. 1037 (W.D.N.C. 1973) (in case involving seventh grade teacher disciplined for his responses to students' questions in class, court ruled in favor of the teacher, noting that a teacher's entitlement to First Amendment protection "is no longer in doubt") (quotation omitted).

In cases pertaining to speech outside the classroom, we have also emphasized the special importance of First Amendment rights to teachers. See Jurgensen v. Fairfax County, 745 F.2d 868, 880 (4th Cir. 1984) (when analyzing restrictions on government employee speech, the court looks at a spectrum "from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored") (quoting Wieman v. Updegraff, 384 U.S. 183, 195 (1952) (Frankfurter, J., concurring)); Johnson v. Branch, 364 F.2d 177, 179-80 (4th Cir. 1966) (en banc) ("[The Supreme Court] has pointed out on numerous occasions the importance of the teaching profession in our democratic society and the necessity of protecting its personal, associational, and academic liberty."), cert. denied, 385 U.S. 1003 (1967); see also Kim v. Coppin State College, 662 F.2d 1055, 1063-64 (4th Cir. 1981) ("First amendment values should find their purest realization in our schools and universities").

The cases defendants cite for the proposition that teachers have no First Amendment rights when in the classroom stand more for the proposition that teachers may be disciplined for failing to follow school rules, and that teachers do not have the unfettered right to control the school curricula. See Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172, 1176 (3d Cir. 1990); Kirkland, 890 F.2d at 801. In both of these cases, the school's discipline of the teacher resulted not so much from the content of the speech at issue but from the teacher's

13

failure to comply with school rules. See, e.g. , Kirkland, 890 F.2d at 801-02 (Although ruling against the teacher, court cautioned that it did not "suggest that public school teachers foster free debate in their classrooms only at their own risk or that their classrooms must be `cast with a pall of orthodoxy.' We hold only that public school teachers are not free, under the first amendment, to arrogate control of the curricula.") Here, Boring specifically denies that she failed to follow school rules and defendants have yet to prove -- or even plead -- otherwise. Accordingly, those cases are inapposite.

A fair reading of the relevant case law leads us to conclude that the question is not, and never has been, whether teachers have First Amendment rights in the classroom, but how much  school authorities can legitimately restrict those rights. Striking a balance between the school's role as ultimate arbiter of the school curriculum and the teacher's limited in-class speech rights obviously presents a challenge. We believe the approach set forth in Hazelwood, of requiring school authorities to provide a legitimate pedagogical basis for in-class speech restriction, provides the best means of navigating this challenge.

We recognize, of course, that Hazelwood directly addressed the free speech rights of students, not teachers. Although the Supreme Court has never held that the Hazelwood analysis also applies to teachers, certain dicta in Hazelwood support this conclusion. When the Court discussed whether the school newspaper at issue in the case constituted a public forum, it stated that if "no public forum has been created . . . school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." Hazelwood, 484 U.S. at 267 (emphasis added).

Moreover, the rationale that largely animated Hazelwood (relating to the school's right to control certain school-sponsored activities bearing its imprimatur) appears to apply equally well in the context of a teacher's play selection for a school-sponsored drama production. In fact, when discussing whether newspapers could be censored due to the school's interest in not appearing to promote the speech involved, the Hazelwood Court referred to school-sponsored activities such as "publications, theatrical productions , [etc.]" as being within

14

that class of activities that the school could restrict. Id. at 271. (emphasis added).

Several of our sister circuits have agreed that the Hazelwood analysis should apply to teacher speech in the classroom as well as to student speech. The First Circuit adopted the Hazelwood approach to assess restrictions on teacher speech after concluding that a teacher's speech in class, like the student newspaper in Hazelwood, constitutes part of the school-sponsored curriculum. Ward , 996 F.2d at 453. The court concluded that Hazelwood placed a proper, "reasonable" limit on teacher's speech in that setting. Id.; see also Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ., 42 F.3d 719 (2d Cir. 1994) (applying Hazelwood to teacher speech); Miles v. Denver Public Schs., 944 F.2d 773 (10th Cir. 1991) (same). Cf. Bishop v. Aronov, 926 F.2d 1066, 1074 (11th Cir. 1991) (applying Hazelwood to examine a restriction on a university professor's classroom comments about religion). This limit on teacher speech, like the limit on student speech, ensures that students "learn whatever lessons [an] activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." Ward, 996 F.2d at 452 (quoting Hazelwood, 484 U.S. at 271).

Although the Hazelwood analysis protects the in-class speech rights of all teachers, school authorities retain the flexibility to place greater restrictions on teacher speech directed at younger students. Younger students' relative lack of maturity and lesser capacity to comprehend complex material make greater restrictions appropriate. See Webb, 394 F. Supp. at 799 ("state interest in limiting the discretion of teachers grows stronger . . . as the age of the students decreases").

At the secondary school level, school administrators and school boards must be permitted to have final say in setting the appropriate curricula so that students are not exposed to material that detracts from or impedes the school's pedagogical mission. See Board of Educ. v. Pico, 457 U.S. 853, 863-64 (1982) (plurality).* The fact that

_____

*Thus, contrary to the suggestion of our dissenting colleague, we unequivocally hold that school administrators, rather than teachers, have

15

school administrators and school boards, rather than teachers, may have ultimate control over the appropriate curricula means that secondary school teachers' First Amendment rights may be constrained to somewhat narrow confines.

But there remains a limited area in which a teacher's in-class speech, even in secondary schools, retains protection. In fulfilling her function of expressing ideas to students (all day, every day), a high school teacher almost inevitably will mention some topics, and choose some teaching materials that will be perceived as controversial; as noted earlier, even the classics present some controversial themes. Cognizant of the difficulty a teacher faces in selecting course material and subjects devoid of potentially controversial material, several courts have emphasized the importance of prior notice to the teacher before her speech may subject her to discipline. See Ward, 996 F.2d at 453 ("Even if a school may prohibit a teacher's statements before she makes them, . . . it is not entitled to retaliate against speech that it never prohibited"). See also Stachura v. Truszkowski, 763 F.2d 211, 215 (6th Cir. 1985) (emphasizing importance of prior notice), rev'd on other grounds, 477 U.S. 299 (1986); Moore, 357 F. Supp at 1040-41 (same); Webb, 344 F. Supp. at 801 (same); Mailloux v. Kiley, 323 F. Supp. 1387, 1392 (D. Mass.) (same), aff 'd, 448 F.2d 1242 (1st Cir. 1971). In this case, we need not reach the question of what notice school authorities must provide before disciplining a teacher, see infra part V, but we recognize that some notice would appear necessary to

_____

final authority to select curriculum. We part ways with the dissent in its view that every curriculum choice administrators make necessarily involves "legitimate pedagogical concerns." If school administrators prohibited the teaching of foreign languages solely because they hated foreigners, this would certainly be a curriculum choice, but hardly one based on legitimate pedagogical concerns. The very fact that the Supreme Court in Hazelwood held that administrators do not offend the First Amendment in controlling curriculum "so long as their actions are reasonably related to legitimate pedagogical concerns," 484 U.S. at 273, (emphasis added), strongly indicates that the Court believed some curriculum choices would not meet these requirements. Here the administrators may have had legitimate pedagogical concerns, which were reasonably related to their actions, however, unlike the administrators in Hazelwood or Kirkland, they have yet to articulate such concerns.

16

ensure that secondary school teachers' limited First Amendment rights have "breathing space to survive." See Keyishian, 385 U.S. at 604.

In sum, we believe that Hazelwood provides the proper standard for analyzing restrictions on teacher speech in secondary school classes, including the selection of plays for high school drama classes. The district court thus properly chose to employ the Hazelwood standard; our disagreement with the district court lies only with its application of that standard.

IV.

Finally, defendants argue that Boring's complaint merits dismissal because she has not alleged that they deprived her of a valuable government benefit. Boring alleged that in addition to causing her emotional distress, "personal and professional humiliation," and loss of reputation, her transfer from a high school where she taught advanced drama in a nationally recognized program to a junior high school where she could only teach introductory drama, caused her to lose "professional opportunities." Defendants point out, however, that Boring has not alleged that her transfer resulted in a decrease in salary or other financial benefits.

In Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), the Supreme Court addressed the precise question of whether a decision to transfer an employee, without decreasing pay or benefits, could provide the basis for a First Amendment claim. One of the plaintiffs in Rutan alleged that he had been denied a transfer to a position closer to his home in retaliation for his political affiliation. Id. at 67. He did not assert that the position paid more salary or benefits, involved greater responsibility, or even provided more professional opportunities -- just that it was closer to home. Id. In its decision, the Supreme Court expressly held that complaints alleging retaliatory actions relating to "promotions, transfers, and recalls after layoffs" adequately stated First Amendment claims. Id. at 75. (emphasis added).

Circuit precedent, even prior to Rutan, similarly regarded a transfer as a sufficient basis for a First Amendment claim. See, e.g., Piver, 835 F.2d at 1076 (school board's transfer decision, which the school alleg-

17

edly rescinded only after the teacher signed a statement supporting a new principal, provided an adequate ground for a First Amendment claim); Allen v. Scribner, 812 F.2d 426, 434 n.16 (9th Cir. 1987) ("[A] transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer result[s] in no loss of pay, seniority, or other benefit") (quoting Hughes v. Whitmer, 714 F.2d 1407, 1421 (8th Cir. 1983), cert. denied, 465 U.S. 1023 (1984)); McGill v. Board of Educ., 602 F.2d 774, 780 (7th Cir. 1979) (because a transfer in retaliation for speech can provide the basis for a First Amendment claim, jury verdict for teacher upheld). Cf. Huang v. Board of Governors of U.N.C., 902 F.2d 1134, 1139-40 (4th Cir. 1990) (rejecting district court's conclusion that a professors's transfer could not support a claim but affirming dismissal based on insufficient evidence of causation).

DiMeglio v. Haines, 45 F.3d 790 (4th Cir. 1995), is not to the contrary. Indeed, in DiMeglio we acknowledged the Rutan holding, but concluded that by 1990 neither we nor the Supreme Court had held "that an employment action less onerous than those" addressed in Rutan "amounted to a constitutional deprivation." Id. at 806. Since the plaintiff in DiMeglio had not alleged that he was transferred, but only that he was "reassigned" "to a geographic subset of the very region from which he formerly had derived his zoning assignments," we held that the district court erred in not holding the defendant employer entitled to qualified immunity. Id. at 806-07. Because Boring has alleged that she was transferred in retaliation for protected conduct, DiMeglio's limited holding does not apply and Rutan dictates our conclusion that she has adequately stated a claim.

V.

Like the defendants, Boring also offers an alternative argument. She contends that even if the district court correctly determined from her complaint alone that the defendants' reasons for restricting her speech related to legitimate pedagogical concerns, the district court still erred in dismissing her complaint because school authorities failed to provide her with proper notice before disciplining her. Boring maintains that since she was not on notice that her choice of "Independence" could result in discipline (indeed, she asserts facts indicating that defendants affirmatively misled her into believing her

18

play selection had been approved), the defendants could not proscribe her conduct after it had occurred. In response, defendants argue that Boring did have notice and that, in any event, she has failed to raise properly her notice argument in this appeal. Because we have held that the district court erred in dismissing Boring's complaint at this early stage, we need not address Boring's alternative argument at this time.

For the foregoing reasons, we reverse the order of the district court dismissing Boring's complaint for failure to state a claim and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED

WIDENER, Circuit Judge, dissenting:

I respectfully dissent. Judge Thornburg delivered an excellent opinion, and I would affirm the judgment entered upon it.

I.

I note that the only question in the case is whether Mrs. Boring had a First Amendment right violated. Slip, p. 4-5. If she has stated a violation of a First Amendment right, she may be entitled to some relief; if she has not so stated a violation of a First Amendment right, there may be no relief granted.

II.

In connection with her claimed violation of a right under the First Amendment, a restatement of the few essential facts and Mrs. Boring's position is appropriate.

Mrs. Boring was a teacher in the Charles D. Owen High School in Buncombe County, North Carolina. In the fall of 1991, she chose Independence as the play for four student actresses to perform. After the play was performed in a regional competition, upon a parent's complaint, the school principal, Fred Ivey, informed Mrs. Boring that she and the students would not be permitted to perform the play in

19

state competition. After a review of the play by Ivey and the superintendent of schools, Frank Yeager, Ivey relented and permitted performance of the play in the state competition, but with certain scenes deleted. In June 1992, Ivey requested Mrs. Boring's transfer from Owen High School, which was granted, at no loss of pay, and Mrs. Boring was transferred to a middle school. The county board of education, after a hearing for Mrs. Boring, approved the transfer over Mrs. Boring's protest. It is the transfer that Mrs. Boring complains violated her constitutional rights. She says her transfer was " . . . over the ideas expressed in the play[1] and so violated her right to freedom of expression."[2] Slip, p. 4.

III.

The district court held:

> Since Plaintiff has not engaged in protected speech, her transfer in retaliation for the play's production did not violate constitutional standards.

The majority relies on the authority of Hurley v. Irish-American Gay, Lesbian & Bisexual Group, 63 U.S.L.W. 4625 (June 19, 1995), which it construed as giving First Amendment protection to "speech, regardless of whether the speaker originally generates the communication or personally advocates the ideas contained therein . . . ." Slip, p. 6-7. (Giving as examples cable television operators, presentation of speech generated by other persons in opinion pages, etc.).

The majority held:

> Just as selection of the above items constitutes protectable expression, so too a teacher's selection of a play for her class to perform constitutes such expression.

_____

[1] Quotation mark omitted.
[2] Mrs. Boring's transfer may have been due to her damaging a brand new maple floor, but I will assume as she claims, it was because of her claim to be able to select Independence, despite the principal and superintendent of schools.

20

Slip, p. 7.**3**

On that basis, the majority then stated the question and answer:

> The question then becomes whether simply by examining Boring's complaint a court can determine that the defendants' asserted restriction on her speech was "reasonably related to legitimate pedagogical concerns."

> The answer is clear: Boring's complaint tells us nothing about the defendants' "legitimate pedagogical concerns" for restricting her speech. A court, therefore, has no basis for determining whether the restriction reasonably related to such concerns; and Boring specifically alleges that it did not.

Slip, p. 8.

The majority then adopted what it called the approach in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988): "We believe the approach set forth in Hazelwood, of requiring school authorities to provide a legitimate pedagogical basis for in-class speech restriction, provides the best means of navigating this challenge." Slip, p. 14 (referring to a teacher's in-class speech rights).

It reversed the district court for the sole reason that " . . . the district court should not have dismissed the complaint on the theory that the asserted restriction necessarily related to legitimate pedagogical concerns." Slip, p. 9.

IV.

The difficulty with, and I assert the basic error in, the majority decision is that it finesses the central issue in the case: does a teacher have a First Amendment right to select a play which is a part of the curriculum of the school, or do the school authorities have that right?

---

**3** The majority relies on Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969), for this proposition. But Keefe, of course, was pre-Hazelwood.

21

At this point, it is well to note what is not before the court. The district court held against Mrs. Boring on her federal due process claim based on deprivation of property because of her transfer; on her federal liberty interest claim because of her transfer and public speculation growing out of her transfer; on her state claim for violation of free speech; on her state claim for deprivation of due process on account of her transfer; and on her state claim for deprivation of liberty interest. These rulings are not appealed.

The majority correctly notes that Mrs. Boring "only appeals the dismissal of her First Amendment claim." Slip, p. 4. The district court noted that "[t]he issue here is whether Plaintiff 's selection and production of the play was protected speech." And the majority agrees: "a teacher's selection of a play for her class to perform constitutes such [First Amendment protected] expression." Slip, p. 7.

So the question before us is only whether the selection of the play Independence by Mrs. Boring is protected by the First Amendment.**4**

V.

I begin my discussion with the definition of curriculum:

> 3: all planned school activities including besides courses of study, organized play, athletics, dramatics, clubs, and home-room program.

_____

**4** The essential flaw in the majority's decision is illustrated by the footnote on pages 15-16 of the slip opinion which states that it holds that "school administrators, rather than teachers, have final authority to select curriculum." The majority decision, however, holds that "a teacher's selection of a play for her class to perform constitutes such [First Amendment] expression." Slip, p. 7. That this latter statement is the holding of the majority, despite the denial in the footnote I have mentioned, is unequivocally shown by the last two words of the majority opinion: "REVERSED AND REMANDED."

Much of such internal inconsistency is doubtless due to the majority's application of any right a student may have to express himself in the classroom with respect to a curriculum made up by school authorities, to a teacher's claimed right to define for the classroom the curriculum itself.

22

Webster's Third New International Dictionary, 1971, p. 557.

Hazelwood was a case in which the high school principal edited out of a student newspaper two pages on account of their content. The offending stories related to pregnant students and an on-going family dispute between the parents of a student. The newspaper was sponsored by the school, which paid for its printing. The revenue from sales of the paper amounted to about one-fourth of the cost of publishing the paper. The paper was part of a Journalism II course taught by a faculty member who supervised its preparation. Proofs were given to the principal for his approval before printing. The Court held that the newspaper was a part of the adopted curriculum of the school. The suit was instituted by several student staff members of the newspaper who maintained that they had a right under the First Amendment to prevent the principal from deleting the stories with respect to pregnancy and the family quarrel. The Court sustained the principal.

In arriving at its decision, the Court distinguished the question in the cases which require a school to tolerate certain student speech from the question of whether the First Amendment requires the school to affirmatively promote certain student speech. In this connection, in holding that the newspaper was in the second category, the Court stated:

> The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences [footnote omitted].

Hazelwood, 484 U.S. at 271.

Thus, although Hazelwood did not concern a play, rather a newspaper, and did not concern teachers' speech, rather students', it did define a "theatrical production[ ] . . . that students, parents and mem-

23

bers of the public might reasonably perceive to bear the imprimatur of the school" as a "part of the school curriculum." Not only is the Court's definition consistent with Webster, I suggest we discount it at our peril.

VI.

With these thoughts in mind, the majority decision is, in my opinion, in error for two equally valid but related reasons.

A.

Mrs. Boring's selection of the play Independence , and the editing of the play by the principal, who was upheld by the superintendent of schools, does not present a matter of public concern and is nothing more than an ordinary employment dispute. That being so, Mrs. Boring has no First Amendment rights derived from her selection of the play Independence.

In a case following and relying on Hazelwood on facts so near to those in the case at hand as to be indistinguishable, the Fifth Circuit came to the conclusion I have just recited in Kirkland v. Northside Independent School District, 890 F.2d 794 (5th Cir. 1989), cert. denied, 490 U.S. 926 (1990). Kirkland was a case in which the employment contract of a high school history teacher was not renewed. He alleged the nonrenewal was a consequence of his use of an unapproved reading list in his world history class. The high school had provided the teacher with a supplemental reading list for his history class along with a copy of the guidelines used to develop and amend that list. He was aware of the guidelines and understood that if he was dissatisfied, a separate body of reading material could be used in his class if he obtained administrative approval. The teacher, however, used his own substitute list and declined to procure the approval of the school authorities for his substitute list. The authorities at his high school then recommended that his contract not be renewed at the end of the next academic year, which was affirmed by the board of trustees, much like Mrs. Boring's transfer was affirmed by the school board in this case after a recommendation by the administrative authorities.

24

The court held that to establish his constitutional claim, Kirkland must have shown that his supplemental reading list was constitutionally protected speech; not different from Mrs. Boring's selection of the play Independence in this case. It went on to hold that under Connick v. Myers, 461 U.S. 138 (1983), the question of whether a public employee's speech is constitutionally protected depends upon the public or private nature of such speech. It decided that the selection of the reading list by the teacher was not a matter of public concern and stated that:

> Although, the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public school curricula. [footnote omitted]

890 F.2d at 800. And the Kirkland court recognized that Hazelwood held that public school officials, consistent with the First Amendment, could place reasonable restrictions upon the subject matter of a student published newspaper and also that schools are typically not public forums.

The court stated that "[w]e hold only that public school teachers are not free, under the first amendment, to arrogate control of curricula," 890 F.2d at 802, and concluded as follows:

> In summary, we conclude that Kirkland's world history reading list does not present a matter of public concern and that this case presents nothing more than an ordinary employment dispute. Accordingly, Kirkland's conduct in disregarding Northside's administrative process does not constitute protected speech . . . .

890 F.2d 802.

Since Mrs. Boring's dispute with the principal, superintendent of schools and the school board is nothing more than an ordinary employment dispute, it does not constitute protected speech and has no First Amendment protection, I submit. Her case is indistinguishable from Kirkland's.

25

B.

Even accepting, for argument only, the decision of the majority that Mrs. Boring's selection of the play Independence was accorded some kind of First Amendment protection, it also erred in holding that the district court erred in holding that "the asserted restriction [of Mrs. Boring's selection] necessarily related to legitimate pedagogical concerns."

Pedagogical is defined as "2: of or relating to teaching or pedagogy. EDUCATIONAL." Webster's Third New International Dictionary, 1971, p. 1663.

There is no doubt at all that the selection of the play Independence was a part of the curriculum of Owen High School.

The makeup of the curriculum of Owen High School is by definition a legitimate pedagogical concern. Not only does logic dictate this conclusion, in only slightly different context the Eleventh Circuit has so held as a matter of law: "Since the purpose of a curricular program is by definition `pedagogical' . . . ." Searcey v. Harris, 888 F.2d 1314, 1319 (11th Cir. 1989).

If a play which is to be performed under the auspices of a school and which is a part of the curriculum of the school, is not by definition a legitimate pedagogical concern, I submit that nothing could be.

So, in my opinion, the majority erred in reversing the district court for its holding to that effect.

VII.

In a more general vein, I do not know of a more significant case to be decided in this court in my experience. The question is who is to set the curriculum, the teachers or the school authorities. Who is to first influence young minds?

From Plato to Burke, the greatest intellects of Western civilization have acknowledged the importance of the very subject at hand and have agreed on how it should be treated.

26

> For a young person cannot judge what is allegorical and what is literal; anything that he receives into his mind at that age is likely to become indelible and unalterable; and therefore it is most important that the tales which the young first hear should be models of virtuous thoughts.

Plato's Republic: Book II, Jowett Translation, Walter J. Black, Inc., 1942, p. 281.

> The magistrate, who in favor of freedom thinks himself obliged to suffer all sorts of publications, is under a stricter duty than any other well to consider what sort of writers he shall authorize, and shall recommend by the strongest of all sanctions, that is, by public honors and rewards. He ought to be cautious how he recommends authors of mixed or ambiguous morality. He ought to be fearful of putting into the hands of youth writers indulgent to the peculiarities of their own complexion, lest they should teach the humors of the professor, rather then the principles of the science.

Letter to a Member of the National Assembly (1791). IV, 23-34, found in The Philosophy of Edmund Burke, University of Michigan Press, 1960, p. 247.

No matter who sets the curriculum of a school, the younger the student the more especially my complaint should apply. That the curriculum of the school has an influence on young minds may not be exaggerated. The question is who shall set the curriculum, teachers who are responsible only in the most remote sense, or school authorities who are responsible in the sense that in the last analysis they must answer to political authorities because of the saving aspect of Art. IV, Sec. 4 of our Constitution which provides that each State must have a republican form of government. The argument may be that young minds are better in the hands of teachers who are regulated only by the First Amendment and by federal judges who are appointed during good behavior and are not responsible in any sense except by way of impeachment to the public which they serve. But I believe that is not so, young minds are better served by local school authorities with input from parents.

27

The Fifth Circuit recognized just this problem in <u>Kirkland</u> stating:

>It does not matter, for purposes of influencing young minds, whether such power is exercised, to the exclusion of others, by the government or public school teachers.

890 F.2d at 801.

I agree with Justice Frankfurter, in concurrence, who related the four essential freedoms of a university, which should be no less obtained in public schools unless quite impracticable or contrary to law:

>It is an atmosphere in which there prevail `the four essential freedoms' of a university--to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.

<u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 255, 263-264 (1957) (quoting from a statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities [footnote omitted]).

In conclusion, I do not think the majority will take issue with the fact that someone has to set the curriculum for public schools. In my opinion, the curriculum should be set by the local administrative authorities and not the teachers. This is a business federal judges should keep out of absent a constitutional imperative not present here.

28