136 F.3d 364
 124 Ed. Law Rep. 56, 13 IER Cases 1189
 Margaret BORING, Plaintiff-Appellant,
v.
The BUNCOMBE COUNTY BOARD OF EDUCATION; Charles Johnson,
Chairman, Michael Anders; Terry Roberson; Bruce Goforth;
Bill Williams; Grace Brazil; Wendell Begley; Dr. J. Frank
Yeager, Superintendent; Fred Ivey, Principal, each in
his/her individual and official capacity, Defendants-Appellees,
National School Boards Association; North Carolina School
Boards Association; Virginia School Boards
Association Council Of School Attorneys,
Amici Curiae.
 No. 95-2593.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 4, 1997.
Decided Feb. 13, 1998.
 
 ARGUED: Jeremiah Andrew Collins, Bredhoff & Kaiser, P.L.L.C., Washington, DC, for Appellant. Jim D. Cooley, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Charlotte, NC, for Appellees. ON BRIEF: Leon Dayan, Bredhoff & Kaiser, P.L.L.C., Washington, DC; S. Luke Largess, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, for Appellant. W. Clark Goodman, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Charlotte, North Carolina, for Appellees. August W. Steinhilber, NSBA General Counsel, Gwendolyn H. Gregory, Deputy General Counsel, National School Boards Association, Alexandria, VA, for Amicus Curiae National School Boards Association. Michael Crowell, Tharrington Smith, L.L.P., Raleigh, NC; Ann W. McColl, Legal Counsel, North Carolina School Boards Association, Raleigh, NC, for Amicus Curiae North Carolina School Boards Association. J.T. Tokarz, Jonathan A. Stanley, Richmond, VA, for Amicus Curiae VSBA Council.
 Before WILKINSON, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.
 Affirmed by published opinion. Judge WIDENER wrote the majority opinion, in which Chief Judge WILKINSON, Judge RUSSELL, Judge WILKINS, Judge NIEMEYER, Judge LUTTIG and Judge WILLIAMS joined. Chief Judge WILKINSON wrote a concurring opinion. Judge LUTTIG wrote a concurring opinion, in which Judge WILKINS and Judge WILLIAMS joined. Judge HAMILTON wrote a dissenting opinion, in which Judge MURNAGHAN joined. Judge Motz wrote a dissenting opinion, in which Judge HALL, Judge Murnaghan, Judge ERVIN, Judge HAMILTON and Judge MICHAEL joined.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 The only issue in this case is whether a public high school teacher has a First Amendment right to participate in the makeup of the school curriculum through the selection and production of a play. We hold that she does not, and affirm the judgment of the district court dismissing the complaint.
 
 I.
 
 2
 Margaret Boring was a teacher in the Charles D. Owen High School in Buncombe County, North Carolina. In the fall of 1991, she chose the play Independence for four students in her advanced acting class to perform in an annual statewide competition. She stated in her amended complaint that the play "powerfully depicts the dynamics within a dysfunctional, single-parent family--a divorced mother and three daughters; one a lesbian, another pregnant with an illegitimate child." She alleged that after selecting the play, she notified the school principal, as she did every year, that she had chosen Independence as the play for the competition. She does not allege that she gave the principal any information about the play other than the name.
 
 
 3
 The play was performed in a regional competition and won 17 of 21 awards. Prior to the state finals, a scene from the play was performed for an English class in the school. Plaintiff informed the teacher of that class that the play contained mature subject matter and suggested to the teacher that the students bring in parental permission slips to see the play. Following that performance, a parent of one of the students in the English class complained to the school principal, Fred Ivey, who then asked plaintiff for a copy of the script. After reading the play, Ivey informed plaintiff that she and the students would not be permitted to perform the play in the state competition.
 
 
 4
 Plaintiff and the parents of the actresses performing the play met with Ivey urging him not to cancel the production. Ivey then agreed to the production of the play in the state competition, but with certain portions deleted. The complaint states that the students performed the play in the state competition and won second place. The complaint does not state, but we assume, that the play was performed in accordance with Ivey's instructions.
 
 
 5
 In the summer of 1991 the school moved to a new facility which had a maple stage floor in the auditorium. At the time of the move, plaintiff discussed with Ivey the problems with mounting productions on the maple floor. Ivey suggested using plywood as a temporary surface over the maple floor but instructed plaintiff to obtain approval before doing any construction work in the auditorium. In the spring of 1992, plaintiff advised Ivey that she needed to construct sets for the production of a musical. Ivey responded that he understood the need for sets and that prior approval was intended to apply only to the construction of fixtures. In preparation for the musical, the surface of the maple floor of the stage was covered with plywood fixed to the floor with screws. When the plywood was removed after the play, the floor had to be refinished because of the holes left by the screws.
 
 
 6
 In June 1992, Ivey requested the transfer of Margaret Boring from Owen High School, citing "personal conflicts resulting from actions she initiated during the course of this school year." Superintendent Yeager approved the transfer stating that she had failed to follow the school system's controversial materials policy in producing the play. Plaintiff states that the purpose of the controversial materials policy is to give the parents some control over the materials to which their children are exposed in school. She alleges that at the time of the production, the controversial materials policy did not cover dramatic presentations, and that the school's policy was amended subsequently to include dramatic presentations.
 
 
 7
 Plaintiff appealed the transfer to the Board of Education. A hearing was held on September 2, 1992, following which the Board upheld the transfer. Plaintiff alleges that prior to the hearing there was considerable public discussion of the transfer, including that the play was obscene and that she was immoral. She alleges that members of the school board asked questions at the hearing that demonstrated their consideration of matters outside the evidence presented at the hearing.
 
 
 8
 Plaintiff filed the present action on January 10, 1994. Her amended complaint claims that her transfer was in retaliation for expression of unpopular views through the production of the play and thus in violation of her right to freedom of speech under the First and Fourteenth Amendments and Article I, § 14 of the North Carolina Constitution. She also claimed a violation of due process under the Fourteenth Amendment and Article I, § 19 of the North Carolina Constitution based on the allegation that members of the school board considered information that was not presented at the hearing; and a violation of a liberty interest under Article I, §§ 1 and 19 of the North Carolina Constitution.
 
 
 9
 The district court construed the complaint broadly. Not only did it address plaintiff's federal First Amendment claim, it considered claims plaintiff may have made under the federal due process clause of the Fourteenth Amendment; a federal liberty interest claim under the Fourteenth Amendment; a state claim for violation of free speech; a state claim for deprivation of due process; and a state claim for deprivation of liberty. It decided against the plaintiff on each of these claims.
 
 
 10
 Plaintiff appeals only the dismissal of her federal First Amendment claim. A divided panel of this court reversed the district court's dismissal of that claim which decision was vacated by the order of the en banc court which granted rehearing. Boring v. Buncombe County Bd. of Educ., 98 F.3d 1474 (4th Cir.1996), vacated by order of December 3, 1996. We now affirm the judgment of the district court holding that the plaintiff's selection and production of the play Independence as part of the school's curriculum was not protected speech under the First Amendment.
 
 
 11
 We review a dismissal for failure to state a claim de novo, drawing all reasonable inferences in favor of the plaintiff and accepting the allegations that are stated in the complaint as true. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.), cert. denied, 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993).
 
 II.
 
 12
 The district court held that the play was a part of the school curriculum and:
 
 
 13
 Since plaintiff has not engaged in protected speech, her transfer in retaliation for the play's production did not violate Constitutional standards. (A.71)
 
 
 14
 With this holding, the plaintiff takes issue on appeal as follows:
 
 
 15
 Whether the district court erred in holding that plaintiff's act of selecting, producing and directing a play did not constitute "speech" within the meaning of the First Amendment. (Boring's brief, p. vi)
 
 
 16
 We begin our discussion with the definition of curriculum:
 
 
 17
 3: all planned school activities including besides courses of study, organized play, athletics, dramatics, clubs, and homeroom program.
 
 
 18
 Webster's Third New International Dictionary, 1971, p. 557.
 
 
 19
 Not only does Webster include dramatics within the definition of curriculum, the Supreme Court does the same. In Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), a case involving student speech in a school newspaper which was edited by the principal of a high school, the Court distinguished cases which require a school to tolerate student speech from those cases in which the school must affirmatively promote student speech. Although in different context, the reasoning of the Court as to what constitutes the school curriculum is equally applicable here.
 
 
 20
 The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences [footnote omitted].
 
 
 21
 Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570.
 
 
 22
 It is plain that the play was curricular from the fact that it was supervised by a faculty member, Mrs. Boring; it was performed in interscholastic drama competitions; and the theater program at the high school was obviously intended to impart particular skills, such as acting, to student participants. These factors demonstrate beyond doubt that "students, parents, and members of the public might reasonably perceive [the production of the play Independence ] to bear the imprimatur of the school." Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570.
 
 
 23
 So there is no difference between Webster's common definition and that of Hazelwood.
 
 III.
 
 24
 With these thoughts in mind, we are of opinion that the judgment of the district court is demonstrably correct.
 
 A.
 
 25
 Plaintiff's selection of the play Independence, and the editing of the play by the principal, who was upheld by the superintendent of schools, does not present a matter of public concern and is nothing more than an ordinary employment dispute. That being so, plaintiff has no First Amendment rights derived from her selection of the play Independence.
 
 
 26
 This principle was illustrated in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), in which the Court upheld the firing of an assistant district attorney who had circulated a questionnaire questioning the manner in which the district attorney operated that office. The Court held that "if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge." Connick at 146, 103 S.Ct. at 1690. Because the questionnaire almost wholly concerned internal office affairs rather than matters of public concern, the court held that, to that extent, it would not upset the decision of the district attorney in discharging Myers.[1] It stated:
 
 
 27
 We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 28
 Connick at 147, 103 S.Ct. at 1690.
 
 
 29
 We followed Connick in DiMeglio v. Haines, 45 F.3d 790 (1995), in which we upheld the transfer of a public employee who had insisted on advising some affected citizens as to the merits of a zoning dispute contrary to the instructions of his employer. We stated "a government employer, no less than a private employer, is entitled to insist upon the legitimate, day-to-day decisions of the office without fear of reprisals in the form of lawsuits from disgruntled subordinates who believe that they know better than their superiors how to manage office affairs." DiMeglio at 806.
 
 
 30
 In a case on facts so near to those in the case at hand as to be indistinguishable, the Fifth Circuit came to the conclusion we have just recited in Kirkland v. Northside Independent School District, 890 F.2d 794 (5th Cir.1989), cert. denied, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). Kirkland was a case in which the employment contract of a high school history teacher was not renewed. He alleged the nonrenewal was a consequence of, and in retaliation for, his use of an unapproved reading list in his world history class. The high school had provided the teacher with a supplemental reading list for his history class along with a copy of the guidelines used to develop and amend that list. He was aware of the guidelines and understood that if he was dissatisfied, a separate body of reading material could be used in his class if he obtained administrative approval. The teacher, however, used his own substitute list and declined to procure the approval of the school authorities for his substitute list. The authorities at his high school then recommended that his contract not be renewed at the end of the next academic year, which was affirmed by the board of trustees, much like Margaret Boring's transfer was affirmed by the school board in this case after a recommendation by the administrative authorities.
 
 
 31
 The court held that to establish his constitutional claim, Kirkland must have shown that his supplemental reading list was constitutionally protected speech; not different from Mrs. Boring's selection of the play Independence in this case. It went on to hold that under Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the question of whether a public employee's speech is constitutionally protected depends upon the public or private nature of such speech. It decided that the selection of the reading list by the teacher was not a matter of public concern and stated that:
 
 
 32
 Although, the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public school curricula. [footnote omitted]
 
 
 33
 890 F.2d at 800. And the Kirkland court recognized that Hazelwood held that public school officials, consistent with the First Amendment, could place reasonable restrictions upon the subject matter of a student published newspaper and also that schools are typically not public forums.
 
 
 34
 The court stated that "[w]e hold only that public school teachers are not free, under the first amendment, to arrogate control of curricula," 890 F.2d at 802, and concluded as follows:
 
 
 35
 In summary, we conclude that Kirkland's world history reading list does not present a matter of public concern and that this case presents nothing more than an ordinary employment dispute. Accordingly, Kirkland's conduct in disregarding Northside's administrative process does not constitute protected speech....
 
 
 36
 890 F.2d at 802.
 
 
 37
 Since plaintiff's dispute with the principal, superintendent of schools and the school board is nothing more than an ordinary employment dispute, it does not constitute protected speech and has no First Amendment protection. Her case is indistinguishable from Kirkland's.
 
 B.
 
 38
 The plaintiff also contends that the district court erred in holding that the defendants had a legitimate pedagogical interest in punishing plaintiff for her speech. Of course, by speech, she means her selection and production of the play Independence.
 
 
 39
 As we have previously set out, the play was a part of the curriculum of Charles D. Owen High School, where plaintiff taught. So this contention of the plaintiff is in reality not different from her first contention, that is, she had a First Amendment right to participate in the makeup of the high school curriculum, which could be regulated by the school administration only if it had a legitimate pedagogical interest in the curriculum. While we are of opinion that plaintiff had no First Amendment right to insist on the makeup of the curriculum, even assuming that she did have, we are of opinion that the school administration did have such a legitimate pedagogical interest and that the holding of the district court was correct.
 
 
 40
 Pedagogical is defined as "2: of or relating to teaching or pedagogy. EDUCATIONAL." Webster's Third New International Dictionary, 1971, p. 1663. There is no doubt at all that the selection of the play Independence was a part of the curriculum of Owen High School.
 
 
 41
 The makeup of the curriculum of Owen High School is by definition a legitimate pedagogical concern. Not only does logic dictate this conclusion, in only slightly different context the Eleventh Circuit has so held as a matter of law: "Since the purpose of a curricular program is by definition 'pedagogical'...." Searcey v. Harris, 888 F.2d 1314, 1319 (11th Cir.1989). Kirkland, 890 F.2d at 795, held the same in the same context present here.
 
 
 42
 If the performance of a play under the auspices of a school and which is a part of the curriculum of the school, is not by definition a legitimate pedagogical concern, we do not know what could be.
 
 
 43
 In our opinion, the school administrative authorities had a legitimate pedagogical interest in the makeup of the curriculum of the school, including the inclusion of the play Independence. The holding of the district court was correct and the plaintiff's claim is without merit.
 
 IV.
 
 44
 The question before us is not new. From Plato to Burke, the greatest minds of Western civilization have acknowledged the importance of the very subject at hand and have agreed on how it should be treated.
 
 
 45
 For a young person cannot judge what is allegorical and what is literal; anything that he receives into his mind at that age is likely to become indelible and unalterable; and therefore it is most important that the tales which the young first hear should be models of virtuous thoughts.
 
 
 46
 Plato's Republic: Book II, Jowett Translation, Walter J. Black, Inc., 1942, p. 281.
 
 
 47
 The magistrate, who in favor of freedom thinks himself obliged to suffer all sorts of publications, is under a stricter duty than any other well to consider what sort of writers he shall authorize, and shall recommend by the strongest of all sanctions, that is, by public honors and rewards. He ought to be cautious how he recommends authors of mixed or ambiguous morality. He ought to be fearful of putting into the hands of youth writers indulgent to the peculiarities of their own complexion, lest they should teach the humors of the professor, rather then the principles of the science.
 
 
 48
 Letter to a Member of the National Assembly (1791). IV, 23-34, found in The Philosophy of Edmund Burke, University of Michigan Press, 1960, p. 247.
 
 
 49
 And Justice Frankfurter, in concurrence, related the four essential freedoms of a university, which should no less obtain in public schools unless quite impracticable or contrary to law:
 
 
 50
 It is an atmosphere in which there prevail "the four essential freedoms" of a university--to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.
 
 
 51
 Sweezy v. New Hampshire, 354 U.S. 234, 255, 263-264, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (quoting from a statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities [footnote omitted] ).
 
 
 52
 We agree with Plato and Burke and Justice Frankfurter that the school, not the teacher, has the right to fix the curriculum. Owens being a public school does not give the plaintiff any First Amendment right to fix the curriculum she would not have had if the school were private. Connick, 461 U.S. at 147, 103 S.Ct. at 1690.
 
 
 53
 Someone must fix the curriculum of any school, public or private. In the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities who are in some sense responsible, rather than to the teachers, who would be responsible only to the judges, had they a First Amendment right to participate in the makeup of the curriculum.
 
 
 54
 The judgment of the district court is accordingly
 
 AFFIRMED.[2],[3]
 WILKINSON, Chief Judge, concurring:
 
 55
 Traditionally, indeed for most of our history, education has been largely a matter of state and local concern. The dissents, however, approach education as a federal judicial enterprise. The dissenters seize upon one loose, slippery, litigious phrase--"legitimate pedagogical concern"--and consign it to the mercies of the federal courts. They provide not one iota of guidance to local school administrators on the interpretation of this tantalizing formulation, nor could they. What is "legitimately pedagogical" will inevitably mean one thing to one judge or jury and something else to another.
 
 
 56
 This is precisely the process by which 42 U.S.C. § 1983 becomes an instrument of disenfranchisement. In this case, that provision would remove from students, teachers, parents, and school boards the right to direct their educational curricula through democratic means. The curricular choices of the schools should be presumptively their ownthe fact that such choices arouse deep feelings argues strongly for democratic means of reaching them.*
 
 
 57
 I would affirm the judgment of the district court.
 
 LUTTIG, Circuit Judge, concurring:
 
 58
 I agree fully with the unassailable conclusion of the majority that the First Amendment does not require school boards to allow individual teachers in the Nation's elementary and secondary public schools to determine the curriculum for their classrooms consistent with their own personal, political, and other views. Thus, I agree with the court's rejection of the dissent's position, see post at 375 (Motz, J., dissenting), that the Buncombe County Board of Education is required by the First Amendment to defend in federal court its decision to disallow Ms. Boring from producing a play on lesbianism in the classrooms of the County's high school.
 
 
 59
 I also agree with the court's application of the public employee speech cases of Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in the resolution of this dispute. Whether or not it can be argued that the standard set forth in these cases is suitable in analyzing restrictions on teachers' in-class noncurricular speech, the standard announced in these cases is eminently reasonable in analyzing restrictions on teachers' in-class curricular speech--unless, of course, one mistakenly assumes, as indeed the dissent does, that every word of curricular speech uttered by a teacher within the classroom is, by definition, speech "as a citizen on a matter of public concern" within the intendment of Connick and Pickering. Cf. post at 378 (Motz, J., dissenting) (asserting that "Connick ... does not provide a workable formula for analyzing whether the First Amendment protects teacher's in-class speech" because all in-class teacher speech is on matter of public concern, but without distinguishing between in-class curricular and in-class noncurricular teacher speech). Indeed, the analogy would seem to be pure between a teacher who, qua teacher, attempts to assert her own views through the curriculum itself, and any other public employee who, qua employee, attempts to assert her personal views through the official policies and decisions of her office. Neither the question of whether a teacher has a First Amendment right when she speaks in the classroom generally, other than through the curriculum itself, nor the question of whether Connick applies in this quite different context, is before the court today, contrary to the belief of the dissent.
 
 
 60
 In reaching the conclusion that the Buncombe County Board of Education is constitutionally required to justify for Ms. Boring its decision not to permit production of the play she selected, the dissent relies on the Supreme Court's decision in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), but selectively quotes from the Court's opinion in that case so as to leave the impression that Hazelwood dealt with a teacher's First Amendment right to express herself through the curriculum itself, rather than with a student's First Amendment right to speak within a curricular setting. Thus, the dissent states that,
 
 
 61
 in Hazelwood the Court held that school administrators' curriculum choices did not offend the First Amendment "so long as their actions are reasonably related to legitimate pedagogical concerns." Indeed, the Court went on to recognize that, on occasion a particular curriculum decision may have "no valid educational purpose" and that in such an instance "the First Amendment is so directly and sharply implicate[d] as to require judicial intervention[;]"
 
 
 62
 post at 376, whereas the Court actually stated:
 
 
 63
 [W]e hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.... It is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so "directly and sharply implicate[d] as to require judicial intervention to protect students' constitutional rights."
 
 
 64
 484 U.S. at 273, 108 S.Ct. at 571 (footnote and citations omitted; emphasis added). From its perceived need to omit from the Hazelwood passages upon which it explicitly relies and partially quotes, all references within those passages--even within the holding itself--to the fact that the Court was concerned in that case only with student speech, it is clear that the dissent recognizes that Hazelwood offers no support for its position in this case.
 
 
 65
 Notwithstanding its obvious recognition of the inapplicability of Hazelwood, the dissent would nevertheless import wholesale Hazelwood's test for evaluating restrictions on student speech within curricular activities into the entirely different context of teacher speech through the curriculum itself. That is, not only does the dissent deny, through simple omission of the relevant portions of text from the Court's opinion, that Hazelwood was concerned only with student speech; it fails to recognize the elementary difference between teacher in-class speech which is curricular, and teacher in-class speech which is noncurricular, because it assumes that every word uttered by a teacher in a classroom is curriculum. In the latter context of teacher in-class noncurricular speech, the teacher assuredly enjoys some First Amendment protection. In the former context of teacher in-class curricular speech, the teacher equally assuredly does not.
 
 
 66
 Of course, we are presented in this case not with student speech within a curricular activity (such as in Hazelwood ), but rather, with teacher or employee speech literally through the curriculum itself. The differences are plain--the ultimate question for our resolution being whether a teacher has a constitutional right to define, at least in part, the school's curriculum, over the informed judgments of both school boards and parents. As noted, mistakenly applying Hazelwood in the first instance, and then, in its alternative reasoning, mistakenly assuming that every word spoken in the classroom by a teacher is a matter of public concern within the meaning of Connick and Pickering, the dissent would hold that every teacher has such a right. Today, however, the court properly concludes that she does not. Of course, were it otherwise--that is, were every public school teacher in America to have the constitutional right to design (even in part) the content of his or her individual classes, as the dissent would have it--the Nation's school boards would be without even the most basic authority to implement a uniform curriculum and schools would become mere instruments for the advancement of the individual and collective social agendas of their teachers.
 
 
 67
 Rhetorically, the dissent attempts to minimize the radicalization of the educational process that would follow upon its proposed holding, by assuring that school officials "must and [would] have final authority over curriculum decisions," and that all that would be required is the mere articulation by the school board of any "legitimate pedagogical concern." Even if these observations as to the dissent's proposed holding were true, the requirement that school systems across the country make their curriculum decisions in anticipation of litigation, and then engage in the time-consuming processes of discovery, pretrial litigation, and trial in federal court to defend as "legitimately pedagogical" their individual curriculum decisions, would itself represent a crushing burden, not to mention a surrender to unelected federal judges of the "final authority over curriculum decisions" that is properly that of school boards and parents.
 
 
 68
 But one should be under no illusions that the particular requirement of "legitimate pedagogy" that the dissent has in mind could ever be so easily satisfied or that, in reality, the dissent contemplates final decisionmaking authority for curriculum resting with the Nation's schoolboards. The indisputable subtext of the dissent, which could hardly go unnoticed, is that "legitimate" pedagogy will be not what the parents and schoolboards decide it should but, rather, what the judges say it will be. If any confirmation of this is necessary, one need look no further than to Judge Hamilton's separate opinion, in which he has already concluded, without even so much as an allegation to this effect by the plaintiff, that the defendants, "all for the sole purpose of shielding the principal and the Board from the wrath of the public outcry," "targeted Margaret Boring as a scapegoat and used her to shield them from the 'heat' of the negative outcry resulting from the performance of Independence." Post at 374 (Hamilton, J., dissenting).
 
 
 69
 Judge Wilkins and Judge Williams join in this concurrence.
 
 HAMILTON, Circuit Judge, dissenting:
 
 70
 I join in Judge Motz's persuasive dissenting opinion. I write separately to emphasize several points. First, the facts as alleged in the complaint suggest strongly that this case is far from an "ordinary employment dispute," i.e., a case involving only speech of a private concern, as the majority dismissively states. Ante at 368. Instead, as gleaned from a fair reading of the complaint, this is a case about a school principal, Fred Ivey, and a county school board, the Buncombe County Board of Education (the Board), who targeted Margaret Boring as a scapegoat and used her to shield them from the "heat" of the negative outcry resulting from the performance of Independence. This is also a case about a dedicated teacher who, contrary to the implication of the majority and concurring opinions, in no way violated any aspect of an approved curriculum; who followed every previously required standard set forth for the selection and approval of the school production; who, when requested to do so, redacted certain portions of the production and only permitted its performance after that performance had been explicitly approved by her principal, Mr. Ivey; yet, who nevertheless lost her position as a result of the production, all for the sole purpose of shielding the principal and the Board from the wrath of the public outcry. Despite the complete absence of any articulated, legitimate reason for restricting Boring's speech, this court today permits her dismissal, in its oblique reference to Federal Rule of Civil Procedure 12(b)(6), without requiring any explanation from Ivey or the Board, holding that they are absolved of any wrongdoing under § 1983, see 42 U.S.C. § 1983, because Boring engaged in no protected speech. Because this dispute originated in, and was entirely the result of, public debate, I believe that the Board, as a public employer that allegedly acted in response to that public debate, should be required to articulate some legitimate, pedagogical concern for restricting Boring's speech. This burden is hardly onerous, and it is the least we can require of public officials charged with making curriculum decisions.
 
 
 71
 Second, it should not be overlooked that this case presents one simple question: Can the Board censor Boring's speech without proffering any legitimate pedagogical concern justifying the restriction? Judge Motz's dissent persuasively explains why the answer to this simple question is no. In all likelihood, if remanded, this case would be resolved in favor of the Board at the summary judgment stage, as several pedagogical concerns probably justified the Board's action. At this early stage, the Rule 12(b)(6) stage, however, we have no basis for determining whether the Board's restriction reasonably related to legitimate pedagogical concerns. For this reason, the judgment of the district court should be reversed and the matter remanded for further proceedings.
 
 
 72
 A final note concerning the concurring opinions of Chief Judge Wilkinson and Judge Luttig. These opinions attack the dissenting opinion as consigning to the federal judiciary the responsibility for managing our public schools. Nothing could be further from reality. What these opinions ignore, however, is that any limited intrusion, whatever it may be, is precisely the intrusion required by the Supreme Court's decision in Hazelwood. The Supreme Court established the Hazelwood standard and, in doing so, clearly envisioned some minimal intrusion into public school management insofar as school administrators would be required to articulate a legitimate pedagogical concern for censoring a student's speech. The Supreme Court apparently did not believe this standard to be too ambiguous for district and appellate courts to apply, nor did it apparently believe this standard to place an unjustly onerous burden on school officials. Therefore, even if the parade of horribles feared by the concurrences came to pass, it is a parade of horribles created by a standard articulated by the Supreme Court and one to which we are bound to adhere until the Supreme Court states otherwise.
 
 
 73
 Judge Murnaghan joins in this dissent.
 
 DIANA GRIBBON MOTZ, Circuit Judge, dissenting:
 
 74
 The majority holds that a teacher's speech in selecting, producing, and directing a school play deserves "no First Amendment protection." Ante at 369. I cannot agree and therefore respectfully dissent. In my judgment, the district court erred in dismissing Margaret Boring's complaint for failure to state a claim upon which relief can be granted.
 
 
 75
 School administrators must and do have final authority over curriculum decisions. But that authority is not wholly unfettered. Like all other state officials, they must obey the Constitution. The Supreme Court has long recognized that the Constitution, specifically the First Amendment, "does not tolerate laws that cast a pall of orthodoxy over the classroom." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). See also Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) ("teachers" no less than "students" do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"). Thus, teachers' in-class speech retains some, albeit limited, First Amendment protection, as is explained in detail in the panel opinion in this case. See Boring v. Buncombe County Bd. of Educ., 98 F.3d 1474, 1475-85 (4th Cir.1996). To that opinion, I add only a few thoughts.
 
 I.
 
 76
 First, although the majority notes the correct standard of review, ante at 367 ("[w]e review a dismissal for failure to state a claim de novo, drawing all reasonable inferences in favor of the plaintiff and accepting the allegations that are stated in the complaint as true"), it fails to apply this standard.
 
 
 77
 Examination of Margaret Boring's complaint is instructive. Boring alleges that she is a "tenured teacher" in the Buncombe County public schools, that she has "built a national reputation for excellence in teaching drama and directing and producing theater," and that "[h]er plays have won numerous awards and, each year, many of her students have gone on to college on theater-related scholarships." She further alleges that in the fall of 1991--twelve years after her initial employment by the Board, after her plays had been "regularly" entered in competition and won "numerous awards"--she notified her principal "as she did every year " of the name of the play she had chosen for the annual competition, and the principal "did not comment or react." (Emphasis added.)
 
 
 78
 True, as the majority observes, Boring "does not allege that she gave the principal any information about the play other than the name." Ante at 366. But a fair reading of the above allegations, let alone a reading that gives Boring "all reasonable inferences" from them, reveals that Boring provided her principal with precisely the same advance notice of the chosen play that she had in every previous year--notice that, until 1991, had been sufficient. According to Boring, the principal did not question her choice, ask for further information, or in any way "comment or react" to her choice. It may be that Boring pulled a fast one on the principal, choosing a more controversial play than in previous years and giving him just its name to preclude negative reaction from him. Nothing in the complaint supports this inference, however, and the School Board has not so asserted.
 
 
 79
 Boring further alleges that no violation of the "controversial materials policy" provided a basis for her transfer and that the play was performed in the state competition only after the principal insisted that she delete certain portions of the play. Taking all of these allegations together, a fair reading of them is that Boring complied with the school administration's requirements and policies in every respect, but was nonetheless disciplined "to punish and retaliate against her for expressing an unpopular point of view through the production of the play" in violation of her First Amendment rights. Thus, as the district court recognized, Boring "does not ask the Court to find that a unilateral selection and production of the play 'Independence,' without prior approval, would have been protected First Amendment speech"; rather, she "argues that having passed on the play prior to its production and performance, the school does not have a right to discipline [her] in retaliation for its use in the curriculum." It is this complaint that Boring presents to us, and this complaint that we must assess to determine whether it states a claim upon which relief can be granted.
 
 
 80
 The Board may indeed have "legitimate pedagogical concerns" that are "reasonably related" to its disciplinary decision. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). But, of course, Boring alleges no such concerns and the Board has not yet stated any. Hence, nothing in the record before us, at this early stage in the proceedings, allows us to draw such a conclusion. Prior to today, every court to consider the matter has required that school administrators offer some evidence--if only an affidavit--to establish the legitimacy of the pedagogical concerns purportedly related to their actions. See Boring, 98 F.3d at 1479. The majority, however, concludes that even this slight evidentiary showing is unnecessary.[1] The majority maintains that because "pedagogical" is defined as "educational," any and every curriculum decision made by school administrators is "by definition a legitimate pedagogical concern" and thus constitutionally acceptable. Ante at 370.
 
 
 81
 The Supreme Court's careful reasoning in Hazelwood, an opinion authored by Justice White and joined by all members of the present Court then sitting (the Chief Justice, and Justices Stevens, O'Connor, and Scalia), offers no support for this astonishing conclusion.[2] Rather, in Hazelwood the Court held that school administrators' curriculum choices did not offend the First Amendment "so long as their actions are reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571 (emphasis added). Indeed, the Court went on to recognize that, on occasion, a particular curriculum decision may have "no valid educational purpose" and that in such an instance "the First Amendment is so directly and sharply implicate[d] as to require judicial intervention." Id. (citation and internal quotation omitted; alteration in original). Thus, the Supreme Court in Hazelwood clearly did not hold, as the majority does here, that each and every curriculum decision is "by definition a legitimate pedagogical concern." Ante at 370 (emphasis added). Instead, the Court meticulously analyzed the speech before it and concluded that the school administrators had demonstrated--through the testimony of several witnesses--the legitimacy of their pedagogical concerns and that for this reason "no violation of First Amendment rights occurred." Id. at 275-76, 108 S.Ct. at 572.
 
 
 82
 Nor do the two cases upon which the majority relies, ante at 370, support its holding that each and every curriculum decision of a school administration is "by definition a legitimate pedagogical concern." In neither Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794 (5th Cir.1989); cert. denied, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990), nor Searcey v. Harris, 888 F.2d 1314 (11th Cir.1989), did the courts hold that the plaintiffs failed to state a claim upon which relief could be granted or that school administrators' decisions were motivated by legitimate pedagogical concerns simply because those decisions concerned the curriculum.
 
 
 83
 In Kirkland, the Fifth Circuit did conclude that the teacher "suffered no impairment of his First Amendment rights." Kirkland, 890 F.2d at 795. But that teacher, Timothy Kirkland, unlike Boring, admitted that he refused to follow the school's well-established rules. For example, he admitted using a "nonapproved reading list." Kirkland, 890 F.2d at 795 (emphasis added). Boring, by contrast, alleges that her principal initially acquiesced in her choice and production of Independence. Moreover, Kirkland did not concede, as Boring does, that the school authorities were entitled to the broad discretion vested in them under the Hazelwood standard. Rather, Kirkland contended that "his control of the world history class curriculum [was] unlimited." Kirkland, 890 F.2d at 801 (emphasis added). The Kirkland court properly rejected this argument. Id. But the Fifth Circuit's reasoning in Kirkland does not foreclose Boring's quite different and far more modest contention that although administrators may discipline a teacher even when the teacher does follow the school's rules, they may do so only "so long as [administrators'] actions are reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. Actually, rather than foreclosing this reasoning, the Kirkland court seemed to embrace it: "Our decision should not be misconstrued ... to suggest that public school teachers foster free debate in their classrooms only at their own risk or that their classrooms must be 'cast with a pall of orthodoxy.' " Kirkland, 890 F.2d at 801-02.
 
 
 84
 In Searcey, the Eleventh Circuit recognized, as I do, that curricular programs by nature have pedagogical purposes. See 888 F.2d at 1319. But it did not hold, as the majority does here, that each and every curricular decision is "by definition a legitimate pedagogical concern." Ante at 370 (emphasis added). In fact, the Eleventh Circuit's holding stands in stark contrast to that set forth by the majority. The Searcey court upheld a judgment against a school board precisely because the board offered "no evidence " to support its challenged requirement. Searcey, 888 F.2d at 1322 (emphasis added). The court reasoned "[w]e cannot infer the reasonableness of a regulation from a vacant record." Id. (citing Hazelwood, 484 U.S. at 275 & n. 8, 108 S.Ct. at 572 & n. 8). Moreover, Searcey expressly rejected the school board's argument that even though it failed to offer any evidentiary support, a court must defer to its decision; the court concluded that this would "overstate[ ] the deference a court must pay to School Board decisions." Id. at 1321. The majority erroneously relies on Searcey to do precisely what the Searcey court itself would not do--overstate the deference due school board decisions and infer the reasonableness of such decisions from a vacant record.
 
 
 85
 The Buncombe County Board of Education may possess legitimate pedagogical concerns reasonably related to its discipline of Boring. But, to date, the Board has not even attempted to state those concerns, let alone offered a scintilla of evidence establishing them. On this record, I do not see how a court can conclude, as the majority does, that "the school administrative authorities had a legitimate pedagogical interest" justifying discipline of Boring and dismissal of her complaint. Ante at 370.
 
 II.
 
 86
 Like the district court, Boring, and the two associations that filed amici briefs on behalf of the School Board (the National School Boards Association and the Virginia School Board Association Council of School Board Attorneys), I believe that the standard articulated in Hazelwood, not that set forth in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), provides the appropriate test for analyzing the speech at issue in this case. But, contrary to the majority's suggestion, even if Connick were applicable here, it would fail to provide an alternative basis on which to dismiss Boring's complaint.
 
 A.
 
 87
 Connick held that a court generally determines whether a public employee's speech is constitutionally protected by balancing the employee's interest, " 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Id. at 142, 103 S.Ct. at 1687 (quoting Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-1735, 20 L.Ed.2d 811 (1968)). Under Connick, Boring must first establish that her speech related to "a matter of public concern." See Connick, 461 U.S. at 146, 103 S.Ct. at 1689. If she does so, school authorities may still prevail, provided they can show that their interest in workplace efficiency and harmony outweighs Boring's interest in commenting upon the matters of public concern. See Board of County Comm'rs v. Umbehr, 518 U.S. 668, ---- - ----, 116 S.Ct. 2342, 2347-2348, 135 L.Ed.2d 843 (1996); Connick, 461 U.S. at 146-147, 103 S.Ct. at 1689-1690; Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-1735.
 
 
 88
 In my view, the Connick framework does not provide a workable formula for analyzing whether the First Amendment protects a teacher's in-class speech. Neither element of the Connick balancing test provides much assistance in assessing whether this speech is entitled to constitutional protection.
 
 
 89
 The public concern element articulated in Connick fails to account adequately for the unique character of a teacher's in-class speech.
 
 
 90
 When a teacher steps into the classroom she assumes a position of extraordinary public trust and confidence: she is charged with educating our youth. Her speech is neither ordinary employee workplace speech nor common public debate. Any attempt to force it into either of these categories ignores the essence of teaching--to educate, to enlighten, to inspire--and the importance of free speech to this most critical endeavor. As the Supreme Court proclaimed more than forty years ago: "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957).
 
 
 91
 Moreover, the governmental interest element as set forth in Connick fails to give school administrators the necessary and appropriate control over a teacher's in-class speech. School administrators should be free to specify curriculum and to curtail classroom speech for any legitimate pedagogical reason. They should not be required to demonstrate that a restriction on in-class speech is necessitated by workplace efficiency or harmony. Accordingly, as more fully set forth in the panel opinion, I believe the simpler and more rigorous Hazelwood analysis should apply to a teacher's in-class speech, as well as a student's in-class speech. See Boring, 98 F.3d at 1482-83.
 
 B.
 
 92
 However, even if the Connick test applied to a teacher's in-class speech, we would be required to conclude that the district court erred in dismissing Boring's complaint. Although Boring's in-class speech does not itself constitute pure public debate, obviously it does "relate to" matters of overwhelming public concern--family life, divorce, motherhood, and illegitimacy, among others. Thus, if the Connick analysis did apply to in-class speech, then Boring's choice and production of a play that raises a number of important social issues obviously falls within the Supreme Court's broad definition of "public concern," which includes speech "relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. at 1690 (emphasis added). See also id. at 149, 103 S.Ct. at 1691 (speech need only "touch" on a matter of public concern in order to trigger an employer's burden to justify restrictions on it).
 
 
 93
 I have trouble understanding the basis for the majority's contrary holding that Boring's selection and production of the play amounts to "nothing more than an ordinary employment dispute" and does not involve a matter of public concern under Connick. Ante at 369. (The majority apparently does not contest one portion of the panel's (now vacated) holding, see Boring, 98 F.3d at 1478-1479, i.e., that Boring's selection and production of the play constitute speech for purposes of the First Amendment. Thus, the majority notes, "[t]his case concerns itself exclusively with employee speech." See ante at 371 n. 2 (emphasis added)).
 
 
 94
 Conceivably, the majority's holding is grounded in misreading Connick to make the role in which a public employee speaks determinative of whether her speech merits First Amendment protection. Connick does distinguish between an employee speaking "as a citizen on matters of public concern" and an employee speaking "as an employee upon matters of personal interest." Connick, 461 U.S. at 147, 103 S.Ct. at 1690. But Connick never holds that a public employee automatically loses all First Amendment protection whenever she speaks in her role as employee on a matter of public concern. Indeed, the Connick Court implicitly repudiates such a conclusion, by directing that factors other than the role of the speaker are critical to determining when an employee speaks on a matter of public concern--"[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." Id. at 147-148, 103 S.Ct. at 1690. Moreover, Connick itself held that one of the statements of the government employee before it, although in the same form and context as her other statements (a questionnaire circulated by the employee only within her office) and although quintessentially speech by an employee in her role as an employee, did "touch[ ] upon a matter of public concern." Id. at 149, 103 S.Ct. at 1691.
 
 
 95
 Furthermore, to read Connick as holding that any speech by a public employee in her role as an employee fails to merit First Amendment protection would contravene other controlling precedent. Both the Supreme Court and this court have held that a teacher's in-class speech, which by definition involves speech by a teacher in her role as an employee, warrants protection. See, e.g., Keyishian, 385 U.S. at 602-603, 87 S.Ct. at 683-684 (regulations inter alia restricting teachers' in-class speech held to violate the First Amendment); Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1081 (4th Cir.1987), cert. denied, 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988). Because the majority does not explicitly hold that the role in which an employee speaks is determinative or attempt to distinguish Keyishian or overrule Piver, this reasoning must not be the basis for its conclusion that Boring's speech does not relate to a matter of public concern.
 
 
 96
 The only other possible basis that I can see for the majority's holding is a mistake as to the nature of Boring's claim. The speech for which Boring seeks First Amendment protection does not constitute a private personnel grievance. Boring does not allege that she selected and produced Independence after being instructed not to choose that play, nor does she allege that school administrators disciplined her because she publicized her dissatisfaction with their treatment of her. Such a claim, much like Kirkland's insistence on using a disapproved reading list, would constitute an "ordinary employment dispute" rather than speech relating to a matter of public concern. Boring instead alleges that the school administration disciplined her for the selection and production of the play itself. This is not an employment dispute. Rather, it is a challenge to a restriction on classroom speech, which involves matters of public concern.
 
 
 97
 Thus, if the Connick analysis applied here, a court could only conclude that Boring has alleged that she was disciplined for speech "relating to a matter of public concern." We would then have to proceed to the other half of the Connick balancing test and examine the school administration's evidence as to the necessity of its restriction of her speech. But, on this record, we could hardly conclude that school administrators had demonstrated that they reasonably believed Boring's speech would disrupt the workplace. They have not even asserted, let alone offered evidence of, disruption. Cf. Connick, 461 U.S. at 151-154, 103 S.Ct. at 1692-1694. (Supreme Court relies on trial testimony of employer that employee's speech caused office disruption). Accordingly, even under Connick, we would be required to hold that the district court erred in dismissing Boring's complaint.
 
 III.
 
 98
 As recognized at the outset of this dissent and in the panel opinion, school administrators must "be permitted to have the final say in setting the appropriate curriculum so that students are not exposed to material that detracts from or impedes the school's pedagogical mission." Boring, 98 F.3d at 1483. Yet, the First Amendment lives in the classroom as it does elsewhere. Indeed, as the Supreme Court stated several decades ago:
 
 
 99
 The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation.
 
 
 100
 Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960) (internal quotation omitted). Justice Stewart wrote these words in the course of holding that the First Amendment prevented public schools from compelling teachers to list all organizations to which they had belonged or contributed in the recent past. But the words apply with equal force here. Rather than "vigilant[ly] protecti[ng] ... constitutional freedoms ... in the community of American schools," the majority eliminates all constitutional protection for the in-class speech of teachers. By holding that public school administrators can constitutionally discipline a teacher for in-class speech without demonstrating, or even articulating, some legitimate pedagogical concern related to that discipline, the majority extinguishes First Amendment rights in an arena where the Supreme Court has directed they should be brought "vividly into operation." For these reasons, I must respectfully dissent.
 
 
 101
 Judges Hall, Murnaghan, Ervin, Hamilton, and Michael join in this dissent.
 
 
 
 [1]
 The last item, that of a question relating to pressuring employees to work in political campaigns on behalf of office supported candidates, the Court considered to be of "limited First Amendment interest." It held that Myers' discharge did not offend the First Amendment because the district attorney "reasonably believed that [the question] would disrupt the office." Connick at 154, 103 S.Ct. at 1694
 
 
 [2]
 It is appropriate to add what we have not decided. This is not a case concerning pupil speech, as in Hazelwood, either classroom or otherwise. This case concerns itself exclusively with employee speech, as does Connick, whether or not a public high school teacher has a First Amendment right to insist on a part of the curriculum of the school. The case does not concern any right a teacher might have to participate in the makeup of the curriculum of a public high school other than the right claimed here under the First Amendment. "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." Connick at 146-147, 103 S.Ct. at 1690
 Plaintiff's contention that she was not given notice as to what was being proscribed is, of course, without merit, the plaintiff having no First Amendment right to participate in the makeup of the curriculum.
 
 
 [3]
 The dissenting opinion of Judge Motz takes issue with the issue in the case as stated by the majority
 As stated by the majority:
 The only issue in this case is whether a public high school teacher has a First Amendment right to participate in the make up of the school curriculum through the selection and production of a play. We hold that she does not....
 Slip, p. 366.
 As stated by Judge Motz:
 The majority holds that a teacher's speech in selecting, producing, and directing a school play deserves "no First Amendment protection." Ante at p. 369, I cannot agree....
 Dissenting opinion of Judge Motz at p. 375.
 The dissent departs, however, from its plain statement of the issue, which is not different from that in Mrs. Boring's brief, p. vi, and on page 376 adopts as the issue an argument of Mrs. Boring, which is she "argues that having passed on the play prior to its production and performance, the school does not have a right to discipline [her] in retaliation for its use in the curriculum." The dissenting opinion then largely proceeds on that theory of Mrs. Boring's argument, rather than the issue as above stated. That argument, however, is apparently based on some kind of due process argument, which was decided adversely to her, and which she has not appealed. This is set out in the majority opinion at p. 367.
 We also note that the dissenting opinion depends, at least in part, on its parenthetical statement, at p. 378, that "[t]he majority apparently does not contest one portion of the panel's (now vacated) holding, see Boring, 98 F.3d at 1478-1479, i.e., that Boring's selection and production of the play constitute speech for purposes of the First Amendment." The insistence on significance of the fact that the majority does not contest a vacated holding of the panel is puzzling, at least, and is worthy of mention only to note that the dissent of Judge Motz emphasizes, as well as does that of Judge Hamilton, that neither logic, nor precedent, nor the wisdom of the ages, supports their position on the issue as stated by Mrs. Boring in her brief on p. vi and restated here on page 367. The dissents erroneously continue to equate "speech" with "protected speech."
 
 
 *
 The dissents contend that all the intrusiveness occasioned by the term "legitimate pedagogical concern" can be ascribed to the Supreme Court. It is obviously not the Supreme Court's use of the phrase to which I object, but the dissents' aggressive misapplication of it to all curricular decisions
 
 
 [1]
 Requiring school authorities to submit a single affidavit demonstrating the factual basis for their pedagogical concerns hardly imposes a "crushing burden" on them. Ante at 372 (Luttig, J. concurring)
 
 
 [2]
 Of course, as noted in the panel opinion, "Hazelwood directly addresses the free speech rights of students, not teachers." Boring, 98 F.3d at 1482. Hazelwood, however, is the Supreme Court's most recent discussion of the protection due curricular speech and the majority and concurrences apparently believe that it is the curricular nature of Boring's speech that deprives it of all First Amendment protection. For this and the other reasons discussed in the panel opinion, I continue to believe that the Hazelwood analysis provides the "best means" of evaluation of the speech at issue here. Id